[Civ. No. 13060.  First Dist., Div. One.  June 27, 1946.]

PHILIP J. MURPHY, Appellant, v. THE BOARD OF MEDICAL EXAMINERS OF THE STATE OF CALIFORNIA et al., Respondents.

· Samuel A. Rosenthal for Appellant.

Robert W. Kenny, Attorney General, and J. Albert Hutchinson, Deputy Attorney General, for Respondents.

SCHOTTKY, J. pro tem.—This is an appeal from a judgment denying a writ of mandate and recalling an alternative writ of mandate theretofore issued in a proceeding brought against respondent Board of Medical Examiners of the State of California to secure a judicial review of the administrative revocation of appellant's certificate of registration as a physician and surgeon on a charge of unprofessional conduct in performing two abortions.

The judicial review proceeding was tried upon the record in the administrative proceeding, the transcript in said proceeding being offered jointly by appellant and respondent in the trial court.

No procedural errors in either the administrative proceeding or in the trial of the mandate proceeding are urged by appellant upon this appeal, but appellant contends that the judgment of the trial court should be reversed upon the following grounds: 1. The board's actions were unreasonable, unwarranted and an arbitrary and illegal exercise of authority, and in direct violation of section 13, article I of the Constitution of the State of California; 2. The evidence is insufficient to sustain the respondent medical board's order revoking appellant's license or the judgment of the trial court denying petitioner's petition for a peremptory writ of mandate.

Appellant's first point deserves scant attention. He contends that because the accusation against him was made by an agent of respondent medical board and said board

heard the evidence and determined appellant guilty, appellant was deprived of his valuable property right to practice medicine without due process of law. No authority is cited in support of this contention, nor, in our opinion, can there be. Under our statutes the right to practice medicine is granted to all qualified persons by respondent board and said board is likewise granted the right (and, indeed, charged with the duty) to hear and determine any accusations bearing upon the qualifications of the licensee to continue the practice of medicine. If a physician whose license is ordered revoked by the board is not satisfied with the determination of the board, he may, as was done in the instant case, apply to the superior court for a review of the board's action, and he then may have a full and complete hearing in the superior court. Not only is he not deprived of a right of property without due process but he is given ample legal opportunity to protect that right.

Appellant's principal contention is that the evidence is insufficient to sustain either the respondent medical board's order or the judgment of the trial court. Before discussing this contention of appellant we shall summarize briefly the evidence, setting forth separately the evidence as to each abortion charge.

## The Ballard Case

On the morning of June 15, 1942, Annie Ghneva Ballard went to appellant's office in Los Angeles and spoke to appellant's nurse, and was told to come back later in the day. She was also told that the fee would be $100. Pursuant to the nurse's instruction, Miss Ballard returned at 11 a. m. the same day, and by that same nurse was taken into a room and told to disrobe. She was supplied with a wrap-around dress and told to lie down upon a table. Appellant came into the room at about 12 noon. He merely said "Hello" to Miss Ballard, washed his hands, and then started inserting a "spreader" and "scissors-like device" into Miss Ballard's private parts. She felt sharp pains inside her abdominal area. Appellant then left the room. Miss Ballard noticed a jar of light red water, which had been extracted from her, on an adjoining table. Appellant made no statements and put no dressing on Miss Ballard, but the nurse placed a sanitary napkin on her, and told her that in "around 24 hours" she "would start having pain" and that she would then pass

something from her body. Miss Ballard went to her home in San Diego, and had to go to the hospital the next morning, June 16, 1942. On that same day, and while still in the hospital, she "passed something" which was "fleshy," of "dark color" and about "7 or 8 inches long."

After leaving the hospital, Miss Ballard had, by the date of the board hearing, three normal menstruations. Immediately prior to her first visit to appellant (on June 15, 1942) Miss Ballard, according to her testimony, was "beside being pregnant," in "fine" physical condition. In February, 1942, she had intercourse, and had "missed" four successive menstrual periods immediately before going to appellant. On the morning of June 15th, prior to her seeing appellant, Miss Ballard had given appellant's nurse an envelope which contained $55 or $60 in currency, together with a memorandum prepared by another doctor. She had gone to that other doctor for a "pregnancy" examination.

Appellant testified that he examined Miss Ballard and discovered her to be approximately four months pregnant. He said he took her temperature, which was 101, then dilated and inserted instruments into her cervix and removed a piece of placental tissue, about the size of his little finger, which was protruding from the uterus. He also admitted depositing some abortafacient substance in the cervix, purposing to have it act as an evacuant. He further admitted that such substance would cause an abortion. He expected Miss Ballard to "pass" the fetus and the remaining placental tissue "later." Appellant further said that when Miss Ballard visited his office she was "bleeding" and "cramping" and "had a smelly discharge."

Appellant put in evidence a "statement" bearing Miss Ballard's signature, indicating that she had already had an abortion attempted upon her, and, presumably, that she was authorizing appellant to operate upon her to "save her life." Miss Ballard's testimony was that she signed a blank card, and the record shows that the body of the statement was in the handwriting of appellant or one of his nurses. No other history or office records on the "treatment" given Miss Ballard was furnished by appellant. Appellant had made no report to any law enforcement or medical association agency concerning the alleged "incomplete abortion" which had been performed on Miss Ballard before appellant administered his "treatment."

## The Palmer Case

On either the 13th or 14th of August, 1942, Mrs. Edith Palmer went to appellant's office in Los Angeles, and was told by his nurse to return later. She returned about a week later together with a Mr. Verdi. Mrs. Palmer did not see appellant, but the same nurse instructed her to disrobe. She was given an anaesthetic and was unconscious while appellant worked on her. When she went to appellant's office she was pregnant, but aside from that condition she was in good health. She had missed one menstrual period prior to going to appellant. Prior to visiting appellant, she had been given a "pregnancy" test by another doctor. While she was under the anaesthetic, $75 was removed from among her clothes, which she had left in the room where she disrobed. When she "came out" of the anaesthetic, she was weak and dizzy, and had "cramps" in her pelvic and abdominal areas. She also, upon awakening, found a dressing over her vaginal area. The transcript shows that Mrs. Palmer did not see appellant even after regaining consciousness, but Mr. Verdi, who came to the office with her, identified appellant.

Several days after leaving appellant's office, Mrs. Palmer noticed a dark discharge from her vagina, and consulted another doctor about it. The discharge continued up until the date of the board hearing on October 22, 1942. Prior to going to appellant's office, Mrs. Palmer did not have any such vaginal discharge.

Appellant had Mrs. Palmer (and Mr. Verdi) sign a card which when put in evidence by appellant, contained the same statement (about a prior incomplete abortion and an operation by appellant to save her life) as was in evidence in the Ballard case. As in the Ballard case, the body of the statement was in the handwriting of appellant or his nurses, and Mrs. Palmer and Verdi testified that the cards were blank when signed by them. As in the Ballard case, appellant offered no other office history or record on the "treatment" given by him to Mrs. Palmer.

Appellant admitted having performed a curettement upon Mrs. Palmer while she was under the anaesthetic on August 21, 1942, and admitted receiving $55 for such. He said that he took her temperature orally, but made no examination of the material he found within her during the pre-operation examination, even though he claimed he found an infection

at that time. He admitted giving her no drug to combat the infection.

Appellant contends "that the state of the evidence is such as to be wholly insufficient to establish that he was guilty of performing a *'criminal abortion'* upon either of these two women."

Section 2377 of the Business and Professions Code, which is the section that appellant was charged with violating, provides: "The procuring or aiding or abetting or attempting or agreeing or offering to procure a criminal abortion constitutes unprofessional conduct within the meaning of this chapter."

A criminal abortion is defined by section 274 of the Penal Code as follows: "Every person who provides, supplies, or administers to any woman, or procures any woman to take any medicine, drug, or substance, or uses or employs any instrument or other means whatever, with intent thereby to procure the miscarriage of such woman, unless the same is necessary to preserve her life, is punishable by imprisonment in the state prison not less than two nor more than five years."

A detailed analysis of the evidence heretofore summarized is not necessary to demonstrate that the respondent Board of Medical Examiners was justified in concluding that appellant committed certain prohibited acts with intent to cause a miscarriage upon the person of Ghneva Ballard, and also upon the person of Edith Palmer, and that the superior court was justified in reaching the same conclusion upon the same record. Indeed, it is difficult to understand how any other conclusion could be arrived at. The evidence showed that both women were pregnant and that defendant knew they were pregnant. Appellant admittedly performed the acts amounting to an abortion. The fact that the women were both in normal health, except for being pregnant, is certainly sufficient to show that the performance of an abortion was not necessary to save the life of either one of them. The evidence shows clearly that all essential elements of a criminal abortion were established, and abundantly sustains the findings that appellant was guilty of violation of section 2377 of the Business and Professions Code.

Most of the authorities cited by appellant relate to the degree of proof required in criminal cases involving charges of abortion. The proceeding here involved is an administrative, disciplinary proceeding, and is not criminal in

its nature, nor is it to be judged by the legal standards applicable to criminal prosecutions. In the late case of *Webster* v. *Board of Dental Examiners*, 17 Cal.2d 534 [110 P.2d 992], our Supreme Court states the rule at pages 537, 538 and 539: "Appellant first challenges the order of suspension on the theory that administrative proceedings to revoke a professional license are quasi-criminal in nature. . . . This analogy between a proceeding to revoke a license and a criminal trial is found in a number of the earlier cases. In some of the decisions, however, language describing the revocation of a license as penal in nature is entirely inapplicable to an administrative proceeding brought for that purpose, because in the particular case the legislature had provided for forfeiture of the professional license as an extra penalty to be added by the criminal court after a conviction for violation of the statute. . . .

"Where, on the other hand, the legislature has created a professional board and has conferred upon it power to administer the provisions of a general regulatory plan governing the members of the profession, the overwhelming weight of authority has rejected any analogy which would require such a board to conduct its proceedings for the revocation of a license in accordance with theories developed in the field of criminal law. . . .

"Some of the cases relied upon by appellant are clearly distinguishable. Thus, *Cavassa* v. *Off, supra* [206 Cal. 307 (274 P. 523)], is not in point because there the legislature actually contemplated a criminal prosecution. The statement in *Messner* v. *Board of Dental Examiners*, 87 Cal.App. 199, 205 [262 P. 58], that such a proceeding is *quasi*-criminal, is *dictum*. In that case the court held that a reasonable construction of the statute required that where one was charged with aiding and abetting an unlicensed person to practice dentistry, it must be shown that the unlicensed person had some control over the rendering of professional services. The court said that there was an *entire absence of evidence* to show any such management of the office by an unlicensed person as the statute contemplated. (87 Cal.App. at p. 204.) This lack of evidence upon a material issue required the annulment of the board's order. The further statement that the proceedings were *quasi*-criminal in nature is *dictum* which is contradicted so far as it relates to matters of evidence by the long line of cases cited above. *Randall* v. *Board of Medi-*

*cal Examiners,* 110 Cal.App. 61, 64 [293 P. 790], does not apply theories of criminal law to matters of evidence. The few remaining decisions which contain language tending to support petitioner's view are contrary to the great weight of authority in California and elsewhere, as pointed out above.''

Appellant does not directly urge, but strongly intimates, that the evidence is insufficient because the two women involved were accomplices. In the first place, the defendant admitted he performed the operations. Moreover, the requirements of corroboration in a criminal case do not apply to administrative proceedings. The true rule is stated in *Lanterman* v. *Anderson,* 36 Cal.App. 472 [172 P. 625], a case in which the revocation for abortion of a physician's license was upheld. The court said at page 477: ''The last contention which we shall notice is that there was no legal or sufficient evidence authorizing the medical board to make the order complained of. The force of this objection rests chiefly upon the assertion that all the material testimony furnished against the appellant was that given by accomplices. The action not being criminal in its nature, it is again apparent that the statutory mandate that a person may not be convicted upon the uncorroborated testimony of an accomplice has no application here. We feel satisfied that any witness whose testimony as to competent facts was convincing to the board engaged in the hearing of the charge would be legally sufficient. . . . We have expressed the conclusion, however, that the testimony of persons who might be accomplices could be received and might be considered by the board trying the charge. There was ample testimony coming from the persons concerned in the commission of the act charged to sustain the determination made by the medical board.'' The Supreme Court denied a hearing in the case. (See, also, *Suckow* v. *Alderson [Board of Medical Examiners]* 182 Cal. 247, 251 [187 P. 965]; *Jordan* v. *Alderson [Board of Medical Examiners],* 48 Cal.App. 547, 549 [192 P. 170].)

Our conclusion is that appellant was given a full and fair hearing before the respondent Board of Medical Examiners and likewise in the superior court; that the record fully sustains the finding of the board and of the trial court, and fully justified the revocation of appellant's license; and that the judgment should be, and the same is hereby affirmed.

Peters, P. J., and Ward, J., concurred.