[Civ. No. 2452. Fifth Dist. Feb. 26, 1976.]

MIDSTATE THEATRES, INC., Plaintiff and Appellant, v.
COUNTY OF STANISLAUS et al., Defendants and Respondents.

[Civ. No. 2453. Fifth Dist. Feb. 26, 1976.]

REDWOOD THEATRES, INCORPORATED,
Plaintiff and Appellant, v.
COUNTY OF STANISLAUS et al., Defendants and Respondents.

**COUNSEL**

Ehrman, Flavin & Morris and Sean Flavin for Plaintiffs and Appellants.

T. W. Martz, County Counsel, Johnathan H. Rowell, John F. Christensen and Harry P. Drabkin, Deputy County Counsel, for Defendants and Respondents.

## OPINION

**CARKEET, J.**\*—This is a combined property tax appeal involving two properties in downtown Modesto. The first is a four-story hotel building, known as the Covell Hotel Building, housing a hotel, theatre, restaurant, cocktail lounge and retail rental spaces, owned by Midstate Theatres, Inc., hereinafter referred to as Midstate. The second is an adjacent property improved with a street level parking area and basement parking garage. It is owned by Redwood Theatres, Inc., hereinafter referred to as Redwood, which wholly owns, and has the same officers and directors, as Midstate.

In issue are the property assessments and taxes on both properties for the fiscal year 1971-1972. For that tax year the assessor assessed the hotel property at a full cash value of $512,850 and an assessed value of $128,135, and the adjacent parking property at a full cash value of $130,000 and an assessed value of $32,500.

On August 25, 1971, plaintiffs (hereinafter called "applicants") filed with the Board of Supervisors of the County of Stanislaus, sitting as a county board of equalization, verified applications for reductions in said assessments pursuant to Revenue and Taxation Code section 1607. The application of Redwood Theatres regarding the parking property was heard before the board on September 5, 1972, and was denied. The application of Midstate Theatres regarding the hotel property was heard before the board on May 23, 1972, and was also denied. On January 29, 1973, after having paid the taxes levied, applicants filed with the board of supervisors claims for refund of a portion of the taxes, and on February 6, 1973, these claims were denied.

On March 20, 1973, both applicants filed complaints in the Superior Court of the County of Stanislaus "to recover taxes erroneously and illegally collected." By stipulation filed August 10, 1973, both actions were set for trial at the same time. Trial was held, without a jury, on September 13, 1973, and a memorandum of decision was filed January 25, 1974, denying Midstate any relief, and remanding the Redwood case to the board on the sole ground that it could not be determined whether or not the board's decision was based in part upon value in use to the owner. The board was instructed to make "a finding of values disregarding any evidence of special value to the owner." Findings of fact and

---

\*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

conclusions of law for the Midstate action were filed July 1, 1974, and for the Redwood action on July 10, 1974. Judgments were entered on the same dates. A notice of appeal from the Midstate judgment was filed July 9, 1974, and a similar notice from the Redwood judgment on July 29, 1974. The appeals have been combined with single briefs for the parties.

The appellants, Midstate and Redwood, predicate their appeal upon three grounds stated in their opening brief as follows:

A. THE BOARD OF EQUALIZATION IN BOTH THE MIDSTATE AND REDWOOD CASES FAILED TO FOLLOW LEGISLATIVE AND ADMINISTRATIVE STANDARDS, USED IMPROPER METHODS OF VALUATION AND MADE MISTAKES IN EQUALIZING THE ASSESSMENT OF APPELLANTS' PROPERTIES AND THE BOARD'S FINDINGS ARE NOT SUPPORTED BY SUBSTANTIAL EVIDENCE.

B. APPELLANTS WERE DENIED A FAIR HEARING.

C. THE BOARD IN BOTH CASES FAILED TO MAKE FINDINGS ON ALL MATERIAL ISSUES (MIDSTATE AND REDWOOD).

Because of the serious due process question involved in the second issue concerning a lack of fair hearing, which compels us to remand this case for a new hearing, we will dispose of the fair trial issue first.

## WERE APPLICANTS DENIED A FAIR HEARING?

Applicants argue that in violation of both Government Code section 31000.7 and procedural due process, the same member of the county counsel's office in both cases (Mr. Rowell) not only represented the county assessor but also advised the board of supervisors to the extent that he also "represented" the board. At the Midstate hearing Mr. Rowell examined the assessor's witnesses, cross-examined applicant's witnesses and argued the case for the assessor. Similarly, at the Redwood hearing, he presented evidence on behalf of the assessor and argued the case for the assessor. At the same time Mr. Rowell also advised the board, and during the Midstate hearing Rowell instructed the board to accept proffered evidence over objection by applicant's counsel. In addition, he advised the board (incorrectly) that it could not rule on the evidence and any ruling must be made by a judge, and he advised the board as to procedure. At the Redwood hearing, Rowell advised the

board on procedure and acknowledged that he was doing just that. He advised the board as to the admissibility of evidence and even ordered a witness not to answer a question.

Perhaps more enlightening are comments by the board members themselves. At one point in the Redwood hearing one member refers to Mr. Rowell as "our attorney," and at another point in the hearing indicates a question should be reasked so that "Mr. Rowell can rule." Moreover, in the proceedings in the court below, Mr. Rowell explicitly states that he "was available for advice to the Board" and that he did in fact offer advice on procedural matters though he claimed he only "represented" the assessor. Moreover, at the Redwood hearing, he flatly stated that, "I advise the board on procedure under the law." The lower court concluded that, "Mr. Rowell's conduct cannot be said to cast him in a dual role as counsel for the Assessor whom he represented and as counsel for the Board. A fair interpretation indicates conduct not infrequently demonstrated by an *advocate* in trial court proceedings. The court concludes that the error, if any, complained of has not resulted in a miscarriage of justice."

Respondent cites *Ford* v. *Civil Service Commission* (1958) 161 Cal.App.2d 692, 697 [327 P.2d 148], for the proposition that, "An Administrative hearing agency may be advised by a county counsel who also represents an adversary county department or agency. . . ." However, the case is not apropos to the Government Code section 31000.7 contention, because the agency involved was advised by one member of the county counsel's office and the adversary commission by another, the exact procedure allowed by section 31000.7.

But, irrespective of section 31000.7, a serious procedural due process question arises from the record in this case.

■ Equalization hearings are quasi-judicial in nature. "[W]hile sitting as a board of equalization, the county board of supervisors is a constitutional agency exercising quasi-judicial powers delegated to the agency by the Constitution." (*Westlake Farms, Inc.* v. *County of Kings* (1974) 39 Cal.App.3d 179, 185 [114 Cal.Rptr. 137].) The taxpayer is entitled not only to a decision in accordance with the evidence but also a fair hearing in compliance with the requirements of procedural due process. (*Universal Cons. Oil Co.* v. *Byram* (1944) 25 Cal.2d 353 [153 P.2d 746]; *Bandini Estate Co.* v. *Los Angeles* (1938) 28 Cal.App.2d 224 [82 P.2d 185].)

"As any tax proceeding is *in invitum* in nature, each step must be taken in compliance with law or the proceeding is void. The equalization stage is no exception to the rule." (*Universal Cons. Oil Co.* v. *Byram, supra,* 25 Cal.2d 353, 361.)

"Tax proceedings are made up primarily of four steps: First, the assessment; second, equalization; third, the computation of tax rate; fourth, collection procedure. It requires the citation of no authority to establish the principle that tax proceedings are *in invitum* and are necessarily strictly construed in favor of the taxpayer." (*Bandini Estate Co.* v. *Los Angeles, supra,* 28 Cal.App.2d 224, 227.)

"Compliance with the constitutional requirement for an equalization hearing is not met unless the substance as well as the form of the hearing is granted to the complaining taxpayer. (*Bandini Estate Co.* v. *Los Angeles County, supra,* at p. 227.) Typical illustrations of the denial of procedural due process which have been held to invalidate purported equalization determinations are: . . . reliance in the concluding steps upon the advice of the assessor or the assessor's attorney, particularly if done secretly (*Morgan* v. *United States,* 304 U.S. 1, 19-20 [58 S.Ct. 773, 82 L.Ed. 1129]) . . . ." (*Universal Cons. Oil Co.* v. *Byram, supra,* 25 Cal.2d 353, 361.)

██ As regards Government Code section 31000.7, the issue reduces itself to a question of whether or not the statute contemplates a difference between "advising" and "representing" a board. Respondent has admitted, and the record amply demonstrates, that he did indeed "advise" the board, but respondent contends he did not "represent" the board. The statute itself is somewhat unclear. Although it first uses the words "advise or represent" when prohibiting dual employment by the same law firm, it couches the exemption for the county counsel's office solely in terms of the word "represent." Applicants argue that the statute uses the words interchangeably and that in popular usage no valid distinction can be drawn between them. There is merit in this contention. To advise means to counsel. Advising and counseling of such a quasi-judicial body by an attorney bearing the official title of deputy county counsel, who is appearing before that body representing a county assessor whose valuations have been challenged, and where the board has engaged no other attorney, so smacks of legal "representation" as to be indistinguishable.

As a further showing that respondents' contention that Mr. Rowell only "advised" the board is in fact a "distinction without a difference," the record itself indicates that the county counsel did in fact represent the board in the eyes of at least one of its members. This member referred to Mr. Rowell as "our attorney," and also states it was Mr. Rowell's function to "rule" on a question. Moreover, the record discloses that Mr. Rowell not only advised the board but appeared to instruct them as to proper actions.

The lower court, however, concluded that even if there was dual representation it was not prejudicial and no miscarriage of justice resulted. Applicants first point out, quite correctly, that a miscarriage in the sense of a different result is difficult, if not impossible to demonstrate. Applicants also argue that the dual representation of Mr. Rowell had a "persuasive effect" on the proceedings in that the board becomes conditioned to following this attorney's views, regardless of the hat he is wearing, and that boards of equalization are often composed of lay persons who might have difficulty distinguishing the different roles of county counsel. Finally, applicants argue that the dual representation of the county counsel contributed to the lack of orderly procedure and the deplorable state of the record noted by the court below.[1]

As noted earlier, the record indicates the board felt Mr. Rowell was their attorney and that it was proper for him to rule on questions. If that is the case, then the effect of his dual role on the proceedings may indeed have been persuasive, and even determinative, thus giving strong support to the claim of lack of procedural due process and a resulting miscarriage of justice.

Respondent cites *Pangburn* v. *C. A. B.* (1st Cir. 1962) 311 F.2d 349, 356, but the case does not support respondents' contention that representation of an adversary county department, and counselling the hearing agency,

---

[1] "The condition of the record leaves much to be desired. It makes the task of the court much more difficult and time consuming. It is suggested that the Board adopt specific rules for the conduct of such hearings especially directed toward outlining simple, orderly procedure in the interest of fairness, of saving time and of preserving a record which will facilitate judicial review." (Midstate clerk's transcript, decision of the trial judge, p. 59.)

At page 38 of the Midstate board hearing transcript (Exh. 24) applicants note that although Rowell had previously cross-examined the witness on behalf of the assessor, he asserts that other assessor witnesses, Gregg and Katsufrakis were also entitled to cross-examine and thereafter these three functioned as a team, cross-examining applicants' witnesses in tandem, with Gregg and Katsufrakis interrupting their cross-examination from time to time with testimony of their own.

present no due process problem. *Pangburn* involved two separate hearings by the C. A. B., one concerning issuance of an aircraft accident report by the C. A. B., and the other, a later C. A. B. hearing concerning an appeal from an order suspending a pilot's rating. The court did not hold the C. A. B. could be both prosecutor and judge in the same proceeding. *Murphy* v. *Board of Medical Examiners* (1946) 75 Cal.App.2d 161 [170 P.2d 510], cited by respondents, can be of little comfort to them. In *Murphy* an accusation against a doctor was made by an agent of the Board of Medical Examiners. After a hearing was held, that board revoked the doctor's license, and the court held this was *not* a violation of due process and noted that the doctor could "apply to the superior court for a review of the board's action, and he then may have a full and complete hearing in the superior court." (*Ibid.,* p. 163.) A review of a decision of the Board of Medical Examiners is a limited trial de novo in which the reviewing court may exercise an independent judgment on all evidence before it. (*Dare* v. *Bd. of Medical Examiners* (1943) 21 Cal.2d 790 [136 P.2d 304].) This is very different from the scope of review in property tax appeals in which the court does not exercise independent judgment but follows the substantial evidence rule. (*Westlake Farms, Inc.* v. *County of Kings, supra,* 39 Cal.App.3d 179, 185.)

In 1966 the Legislature added section 31000.6 to the Government Code (Stats. 1966, First Ex. Sess., ch. 147, § 12), providing as follows: "Upon request of the assessor of the county, the board of supervisors shall contract with and employ legal counsel to assist the assessor in the performance of his duties in any case where the county counsel or the district attorney would have a conflict of interest in representing the assessor."

In 1971 (Stats. 1971, ch. 1104, § 1) the Legislature amended section 31000.6 by adding an additional paragraph which provides that if the board of supervisors does not agree with the assessor that a conflict of interest exists, the assessor may initiate an ex parte proceeding before a presiding judge of the superior court, who may consider affidavits also filed by the district attorney or county counsel and determine if a conflict exists. If so determined the board must immediately employ legal counsel to assist the assessor.

Also in 1971 (Stats. 1971, ch. 1104, § 2) the Legislature added a new section 31000.7 to the Government Code, effective March 4, 1972, reading as follows: "The same law firm shall not be employed to advise or represent both the assessor and the county board of equalization on

any matters relating to hearings before the county board of equalization. This prohibition shall not apply to the county counsel's office. Individual representatives of that office may represent the assessor and the county board of equalization, as long as the same individual does not represent both parties."

The Legislature, in enacting section 31000.7, recognizes the obvious conflicts of interest which can and do arise out of a dual representation, and so worded section 31000.7 as to prohibit the same law firm from being employed to represent both the assessor and the county board of equalization on such matters. But the Legislature then states that the county counsel's office is excepted from this prohibition. Apparently being somewhat fearful of the consequences of its guarded trust in the integrity of the county counsel's office, the Legislature then created its own solution to the conflict of interest problem by providing that the same individual out of the county counsel's office not represent both parties, but that different individuals from the *same* office could represent the assessor and the board, respectively. This legerdemain gave birth to a solution of dubious validity, a determination of which is not necessary to the decision in this case.

Respondents weakly argue that the assessor's counsel "advised" but did not "represent" the board, but candidly admit that a distinction between advocacy (representation) and advice is sometimes difficult to make, or to be understood by laymen. And with commendable frankness respondents admit that *now* the county counsel's office of Stanislaus County supplies two of its four attorneys to attend such hearings.

Respondents argue, however, that the records in these two cases fail to disclose any improper influence by the county counsel upon the board's deliberations, and thus there was no prejudice to the decisional result (as concluded by the trial court).

The plain simple fact remains that section 31000.7 mandates that the same individual from the county counsel's office shall not represent both the assessor and the board. Thus, that statute, however lacking in solidity it might be, was not complied with and the conduct of the two hearings contrary to the clear statutory prohibition was a lack of due process, because it deprived applicants of a fair hearing in each case. (*Universal*

*Cons. Oil Co.* v. *Byram, supra,* 25 Cal.2d 353; *Bandini Estate Co.* v. *Los Angeles, supra,* 28 Cal.App.2d 224.)[2]

Upon this ground alone the judgments must be reversed.

Although the matter will have to be reversed with directions to the trial court to remand these matters to the Stanislaus County Board of Supervisors for further consideration and action in accordance with due process of law, since applicants have raised other issues which might be troublesome at a new hearing, we will pass on the other issues raised for the guidance of the parties on a new hearing.

### DID THE BOARD OF EQUALIZATION IN BOTH THE MIDSTATE AND REDWOOD CASES FAIL TO FOLLOW LEGISLATIVE AND ADMINISTRATIVE STANDARDS, USE IMPROPER METHODS OF VALUATION, AND MAKE MISTAKES IN EQUALIZING THE ASSESSMENT OF APPELLANTS' PROPERTIES, AND ARE THE BOARD'S FINDINGS SUPPORTED BY SUBSTANTIAL EVIDENCE?

At the Midstate hearing before the board of supervisors, the applicant argued that the full cash value of the *hotel property* was $300,000, and presented the testimony of Richard Mann, the president of Midstate Theatres, Mr. William B. David, a registered building designer, Mr. Robert W. Ford, a real estate appraiser, Mr. Jack Retzloff, also a real estate appraiser, and various documentary evidence. Mr. Ford, the principal appraiser for Midstate, did not utilize a comparable sales method of appraising the property because he was unable to find recent sales of comparable properties. Neither did he use a cost approach to value because of the difficulty in estimating depreciation, since the

---

[2]The following are but two examples of the difficulties that arise when the statute is not complied with:

(a) At the Redwood hearing before the board the taxpayer had no attorney present, but was represented by Mr. Mann, the president of Midstate, who cited an American Bar Association opinion on conflicts of interest, which elicited the following outburst from Deputy County Counsel Rowell: "You're charging me with lack of ethics? Then, I will take you on, and you will have to withdraw that pretty soon or leave the room. You better not be in a position to be charging any lawyer with being unethical unless you can back it up." (Exhibit 8, Redwood reporter's transcript, p. 39.)

(b) At the Midstate hearing before the board applicant was represented by Mr. Petrie and the record discloses the following exchange:

"MR. PETRIE: Mr. Chairman, I move the witness's (*sic*) answer be stricken as non-responsive to my question.

"MR. ROWELL: Well, he can't rule on the evidence. The ruling would have to be made by a judge sometime."

The chairman then failed to rule on the motion to strike, after this advice to the board from the attorney for the assessor. (Exhibit 24, Midstate reporter's transcript, p. 71.)

structures were 40 or more years old. Instead, Mr. Ford testified he relied principally upon an income analysis. He estimated the economic rent for the property to be $61,000 per year. Relying on a recent sale of a new small shopping center in Davis, California, he derived a gross rate of return of 14.5 percent and, on the basis of that sale and talks with appraisers and brokers regarding a prior appraisal Mr. Ford had made of the property (which contained several 1967 sales in the Modesto area), as well as a study of rates, Mr. Ford concluded that the hotel property would sell on the basis of 15 percent gross return (including real estate taxes). He then divided $61,000 (the gross economic rent) by 15 percent to reach an approximate value of $400,000. From this value he then deducted $100,000 as the cost of repairs to bring the property up to code. The $100,000 figure was based upon an estimate of $84,000 for repair costs made by Mr. William David, the building designer, to which was added an estimate of architectural fees. Subtracting $100,000 from $400,000, Mr. Ford reached a final value estimate of $300,000. Mr. Retzloff, an additional appraiser, reached a value estimate of $280,000 using substantially the same appraisal procedure, but handling the expenses in a slightly different manner, thus accounting for the $20,000 differential.

The assessor used, to various extents, all three approaches to value. By the *cost approach* the assessor first estimated the replacement cost of the structures to be $847,276. He then deducted 72 percent depreciation to reach a replacement cost less depreciation of approximately $235,000, to which he added a land value of $215,000, personal property valued at $48,850, and fixed theater improvements valued at $15,000, to reach a total full cash value of $512,850. In addition, using an *abbreviated income approach,* the assessor took the *unadjusted* sales prices of 4 properties in *Stockton,* divided them by actual rental income, to obtain 4 gross rent multipliers (the number by which monthly income is multiplied to get value) equalling 117, 115, 111 and 110. He then multiplied a monthly income for the hotel property of $5,083 ($61,000 divided by 12) by a gross rent multiplier of 115 to reach a value conclusion of $584,000. Finally, the assessor made short *market comparisons* of the four properties to reach value indications for subject property of $387,715, $390,946, $444,257 and $533,916.

At the separate Redwood hearing the principal witness for the applicant was Mr. Robert Crisp, a real estate appraiser employed by Mr. Ford's office, who testified to a value of $100,000 for the *parking property* on the basis of its highest and best use being as a site for eventual

construction of a commercial building. The value estimate was based on four sales in the vicinity, of both improved and unimproved property.

The assessor used variations of all three approaches to value. By a *cost* analysis the assessor took 1965 historical cost for the improvements, trended it up by use of a cost index to 1971 cost, then deducted 40 percent observed depreciation to reach a value for the improvements of $42,000. To this was added a land value of $88,000 for a total value of $130,000. The land value was derived through an analysis of twelve sales, four of which were above the assessor's final per square foot value for subject property, and the same four of which were all of improved property. Finally, in deriving the land value the assessor also used a rough gross income multiplier analysis, whereby the land values for five properties were estimated by land comparisons and these values were in turn divided into gross incomes to compute gross income multipliers (which actually appear to be rates of return and not technically multipliers). A sixth property, representing an actual land sale, was similarly analyzed.

■ There are two separate issues a reviewing court must consider in reviewing decisions of a local tax appeals board. The first is whether the board's decision is supported by substantial evidence (*Westlake Farms, Inc.* v. *County of Kings, supra,* 39 Cal.App.3d 179, 183). The second issue relates to the valuation figure and method of valuation used by the assessor and the board. These are reviewable for "arbitrariness, abuse of discretion, or failure to follow the standards prescribed by the Legislature" (*De Luz Homes, Inc.* v. *County of San Diego* (1955) 45 Cal.2d 546, 564 [290 P.2d 544]; *Hunt-Wesson Foods, Inc.* v. *County of Alameda* (1974) 41 Cal.App.3d 163, 177-178 [116 Cal.Rptr. 160]; *County of Amador* v. *State Board of Equalization* (1966) 240 Cal.App.2d 205, 216 [49 Cal.Rptr. 448]).

In 1969, the Legislature enacted Revenue and Taxation Code section 402.5 governing use of comparable sales. The section reads: "When valuing property by comparison with sales of other properties, in order to be considered comparable, the sales shall be sufficiently near in time to the lien date, and the properties sold shall be located sufficiently near the property being valued, and shall be sufficiently alike in respect to character, size, situation, usability, zoning or other legal restriction as to use unless rebutted pursuant to Section 402.1, to make it clear that the properties sold and the properties being valued are comparable in value and that the cash equivalent price realized for the properties sold may

fairly be considered as shedding light on the value of the property being valued. . . ."

In addition, pursuant to Government Code section 15606, the State Board of Equalization adopted rules governing both local boards of equalization and assessors (Cal. Admin. Code, tit. 18, §§ 1-60). The most important to the case at hand are rule 4 governing the comparative sales approach to value, rule 6 governing the cost approach to value, and rule 8 governing the income approach to value.

■ It is established law that the assessing officers are presumed to " ' "have properly performed the duties entrusted to them and, consequently, that the assessments are both regularly and correctly made" ' " (*Griffith* v. *County of Los Angeles* (1968) 267 Cal.App.2d 837, 842 [73 Cal.Rptr. 773].)

Applicant contends that the assessor and the board violated both Revenue and Taxation Code section 402.5 and the State Board rules in various respects.

1. *Did the Appraisal Methods Used by the Assessor and the Board Violate Revenue and Taxation Code section 402.5 or California Administrative Code, Title 18, Sections 2, 4, 6 or 8?*

As noted earlier, one approach used by the assessor in valuing the Midstate property was capitalizing gross income by use of a gross income multiplier (GRM), derived through 4 comparable sales, the actual gross income of which was divided by actual sales prices to yield a range of GRMs from 111 to 117. No specified adjustments were made to the raw data as required by rules 4 and 8. The assessor apparently made an *overall adjustment* to take into account the numerous dissimilarities between the subject and comparable properties and selected a GRM for the subject property of 115, and also selected a final value estimate some $70,000 less than the value indicated through use of a 115 GRM.

■ Applicant argues that the four comparables relied on by the assessor and the board were not comparable within the legislative standards and the prescribed adjustments to permit their use were not made. Applicant points out that sale No. 1 was a sale from a mother to her son with the sales price artificially inflated for tax purposes; that all four sales involved down payments ranging from 6 percent to 29 percent with the sellers accepting deeds of trust and other noncash items; that

three sales occurred in 1965, six years prior to the lien date, and one sale in 1967, four years prior to the lien date; that the sales data had been obtained from the Division of Highways without verification; and that all four sales occurred in the City of Stockton, while the subject property is situated 35 miles south in the City of Modesto.

Applicant cites both Revenue and Taxation Code section 402.5, and state board rule 4 (Cal. Admin. Code, tit. 18, § 4) as setting forth requirements of comparability which must be met in order to utilize sales of properties as comparables, and argues that the use of the above comparables violates such standards because of the major dissimilarities listed above. The lower court disagreed, stating that, "Where 'true comparability' is difficult, a broader range in the use of sales as comparables should be allowed. Although dissimilarities between the sales considered by the Assessor may be noted as to time, place, size, etc., it appears that all of these sales shed light on the value of the subject property."

We agree with the lower court's conclusion. Standards of comparability can never be treated in absolute terms. Even relatively poor data can "fairly be considered as shedding light on the value of the property being valued" (Rev. & Tax. Code, § 402.5) if it is the best or only data available. Admittedly in this case, only poor comparable data was available, and under such circumstances, the use by the assessor of his four comparables was merely the use of the best available market data. As such, in spite of major dissimilarities, it cannot be said use of the comparables violated Revenue and Taxation Code section 402.5 or rule 4. This is especially true in light of the principles stated in *Georgia-Pacific Corp.* v. *County of Butte* (1974) 37 Cal.App.3d 461, 472 [112 Cal.Rptr. 327], to the effect that ". . . in reviewing evidence conflicts are to be resolved in favor of respondent and all legitimate and reasonable inferences indulged to uphold the determination of the trier of fact whether judge or jury."

However, applicant makes a second and far more compelling argument. Under state board rule 4 (Cal. Admin. Code, tit. 18, § 4), in using sales prices of comparable properties, "the assessor *shall*: (a) convert a non-cash sale price to its cash equivalent. . . . (c) convert a nonlien-date sale price into its lien-date equivalent by adjusting it for any change in price level. . . . (d) make such allowances as he deems appropriate for differences . . . in physical attributes, . . . location . . . and the income and amenities which the properties are expected to produce." (Italics added.) The assessor admittedly made no *specific adjustments* for

any of these factors, *nor specific conversions of prices into cash equivalents.* To the contrary, the assessor indicated he merely made an *overall adjustment* to account for these various factors in selecting a final GRM for the subject property, and a final value conclusion. Applicant argues such a method violates rule 4.

Technically speaking the assessor asserts he made the required adjustments, though admittedly solely through a final overall adjustment. Strictly speaking, therefore, the issue is not whether the assessor made the adjustments but whether he made them in a permissible manner. The basic problem with the assessor's approach is that in practical terms it emasculates rule 4. Such an approach does not square with the spirit of rule 4 which carefully lists specific adjustments that are to be made, nor with the reasoning of the state board's general appraisal manual which states that, "Each adjustment should receive separate and serious consideration" (Assessor's Handbook AH 501-102). If rule 4 is to be considered as having any substance, the assessor must be prepared to show a separate consideration of and specific adjustment for noncash sales and differentials in time and size.

Applicant next argues that the assessor used improper methods in valuing the Redwood parking property, because he relied upon twelve sales, four of which were above his final value conclusion and eight of which were below. All four of the high sales were of improved property yet the assessor made no specific adjustments on that account. In essence, the applicant is arguing that the assessor and the board utilized an improper highest and best use for the comparable properties by failing to make any adjustments for improvements. The fact is that a property's highest and best use is often a dispute of fact rather than an established certainty. Though the assessor may have justified making no adjustment for improvements on the basis of his conclusion the properties were bought solely for parking, implicit in such reasoning is the further conclusion that the highest and best use of the comparable properties was for parking, in other words, as bare land without improvements. If that is the case then no adjustments for improvements were necessary since the improvements would not have added to the comparable properties' value. The assessor is not bound by applicant's theory of the highest and best use.

The applicant next argues that the assessor's method in valuing the Redwood property was improper in that the assessor and the board made no adjustments for cash equivalents, time, or other factors, and in fact did not know the terms of the sales.

For the same reasons above discussed concerning the Midstate property, this argument appears well-founded. The assessor's appraisal report indicates no adjustments for cash equivalents or time as required by rule 4, except a lump sum adjustment apparently contained in the final value choice (a value somewhere in the middle of the values indicated by all 12 sales). For reasons outlined earlier such a method is a noncompliance with rule 4 and is disapproved.

Applicant next argues that use of the cost approach in valuing the Midstate property also violates the state board rules, specifically rules 6 and 8 (Cal.Admin.Code, tit. 18, §§ 6, 8).[3]

The substance of these rules is that the cost approach is preferred for new improvements that have suffered little or no depreciation or obsolescence, when neither reliable sales data nor income data are available. The rules also prefer the income approach where reliable sales data are not available and the cost approaches are unreliable because of considerable physical depreciation, functional obsolescence or economic obsolescence.

The Midstate hotel property was at least 40 years old on the lien date and the assessor admitted it had considerable deferred maintenance and was obsolete according to modern construction standards. It clearly was not a subject for the cost approach as a *primary* method of valuation, under rules 6 and 8.

But, as stated by the lower court, rule 6 does not require that the cost approach not be used in valuing a property such as the subject property, "but merely indicates a preference for its use under given circumstances. . . . The use of the mentioned method was not improper, at least to the extent of 'checking' the value obtained against the income method

---

[3] Rule 6 states in part: "(a) The reproduction or replacement cost approach to value is used in conjunction with other value approaches and is preferred when neither reliable sales data (including sales of fractional interests) nor reliable income data are available and when the income from the property is not so regulated as to make such cost irrelevant. It is particularly appropriate for construction work in progress and for other property that has experienced relatively little physical deterioration, is not misplaced, is neither over- nor underimproved, and is not affected by other forms of depreciation or obsolescence."

Rule 8 states in part: "(a) . . . [The income approach] is the preferred approach for the appraisal of improved real properties and personal properties when reliable sales data are not available and the cost approaches are unreliable because the reproducible property has suffered considerable physical depreciation, functional obsolescence or economic obsolescence, is a substantial over- or underimprovement, is misplaced, or is subject to legal restrictions on income that are unrelated to cost."

valuation. . . ." And the findings indicate the income approach was the principal approach used.[4]

Where market or income data is scant, a cost approach might be justified even for a heavily depreciated property, and that is the type of case involved here. In other words, the lower court's determinations that the cost approach in this case was used merely as a check, and, under the circumstances, was validly used, appear to have substantial support in the record and do not require reversal. However, it might be noted that in this case the assessor's method, though perhaps legally supportable, leaves a serious doubt as to whether he used the most reliable method.

■ The applicant next argues that both the assessor and the board failed to make any adjustments in their valuation for the cost of repairs and alterations required to bring the property up to code and cites rule 6(e) and rule 4(d).[5]

Applicant contends that the assessor's method violated the above rules in that adjustments for the required repairs were necessary, and yet the assessor failed to make any such adjustments.

The lower court held that the finding of the board to the effect that the assessor gave *due consideration* to the condition of the building and the necessary repairs was amply supported by the record. However, the issue is not whether "due consideration" was given to the repairs, as indicated by the lower court, but whether there was a required "adjustment" which was not in fact made.

In the cost approach the assessor deducted 72 percent of the replacement cost as depreciation. There is no evidence the cost of repairs was included in the 72 percent depreciation rate, but the fact remains

---

[4]In its finding No. 7, the board states that the income approach was the principal approach used, and the cost approach was merely a check. However, the cost approach yielded the assessor a value conclusion of $512,850, the exact figure placed on the assessment roll.

[5]Rule 6(e) states: "Reproduction or replacement cost shall be reduced by the amount that such cost is estimated to exceed the current value of the reproducible property by reason of physical deterioration, misplacement, over- or underimprovement, and other forms of depreciation or obsolescence."

Rule 4(d) states that the assessor shall: "(d) Make such allowances as he deems appropriate for differences between a comparable property at the time of sale and the subject property on the lien date, or between the subject property at the time of sale and the subject property on the lien date, in physical attributes of the properties, location of the properties, legally enforceable restrictions on the properties' use, and the income and amenities which the properties are expected to produce."

that the legal presumption is that "assessments are both regularly and correctly made" *(Red Bluff Developers* v. *County of Tehama* (1968) 258 Cal.App.2d 668, 673 [66 Cal.Rptr. 229].) In other words, to sustain applicant's burden there must be evidence that the 72 percent depreciation rate *did not* include the cost of repairs. Except for the brief statement in the assessor's report listing adverse conditions, which does not mention repairs required by code, there is no such evidence cited and applicant's burden was not met.

Finally, applicant argues that the assessor used an improper method in valuing the basement space of the Midstate property. Applicant states that the comparable properties used by the assessor contained unusable basement space which was excluded by the assessor when he calculated the per square foot value of the comparables. The subject property, on the other hand, included 10,000 square feet of unusable basement area which was included in valuing the subject property. The result was to increase the value of the subject property by the basement square footage times the assessor's square foot value.

A portion of the basement of the Midstate property is in fact used for various facilities, including a bar, restaurant, and kitchen. The applicant does not contest the inclusion of that area, but solely the inclusion of an additional 10,000 square feet of basement area that was only partly used for storage. The trial court held the contention to be without merit, notwithstanding that three members of the board had expressed the opinion that an adjustment should be made for the basement space. At the oral argument before this court the respondent's counsel conceded that there "may be" an error of $66,000 on the basement question. In view of this concession, upon rehearing, a proper adjustment should be made.

### 2. *Were the Board's Findings Supported by Substantial Evidence?*

Although the basic thrust of appellant's arguments go to the legality of the methods used by the assessor and adopted by the board, appellant also argues that the board's decision was not supported by substantial evidence. The questions of the legality of methods and substantial evidence are distinct (See *Hunt-Wesson Foods, Inc.* v. *County of Alameda, supra,* 41 Cal.App.3d 163, 177-178.) The substantial evidence issue involves: " . . . a review of the quantum of evidence before the board to support the board's factual determination of the value of the taxpayer's properties. *(Georgia-Pacific Corp.* v. *County of Butte, supra,* 37

Cal.App.3d 461, 475.) In discharging its duty '. . . the board's determination upon the merits of the controversy is conclusive; the taxpayer has no right to a trial de novo in the superior court to resolve conflicting issues of fact as to the taxable value of his property. [Citations.] The question presented to the superior court in such an action is whether there was evidence of sufficient substantiality before the board to justify the finding . . . and . . . the board is the sole judge of questions of fact and of the values of property.' (*Bank of America* v. *Mundo, supra,* 37 Cal.2d 1, 5 [229 P.2d 345].)" (*Hunt-Wesson Foods, Inc.* v. *County of Alameda, supra,* 41 Cal.App.3d 163, 177.)

The lower court concluded that the Board's determination was supported not only by substantial evidence but also by the weight of the evidence. (At the time the lower court was unsure whether the "weight of the evidence" or "substantial evidence" was the proper standard of review.) Considering the quantum of raw data presented by the assessor, including numerous comparable sales and utilization of all three approaches to value in at least abbreviated forms, it appears clear that there was credible evidence to support the board's determination, leaving aside the question of whether the assessor's method was legally permissible.

3. *Did the Applicants Sustain Their Initial Burden of Presenting Substantial Probative Evidence of Values Different From the Assessor's Values?*

As indicated earlier, assessments are presumed correct, and the taxpayer has the burden to show an assessment is improper. (*Red Bluff Developers* v. *County of Tehama, supra,* 258 Cal.App.2d at p. 673; *Griffith* v. *County of Los Angeles, supra,* 267 Cal.App.2d at p. 842.)

In this case the taxpayer presented substantial competent evidence of values different from the assessor's and sufficient to make material the inquiry as to whether the assessor's methods were proper. Therefore, the appellants have met their initial burden.

4. *Is the Appeal From the Redwood Judgment Premature?*

While this issue has become moot in view of the fact that this case will be remanded for the reasons hereinabove stated, it would appear that the appeal was not premature or improper under the authority of *Georgia-Pacific Corp.* v. *County of Butte, supra,* 37 Cal.App.3d 461.)

### Did the Board Fail to Make Findings on All Material Issues as Required by Revenue and Taxation Code Section 1605.5 (Now Section 1611.5) and California Administrative Code, Title 18, Section 324(e)?

Applicant argues that the Board's findings in the Midstate case were faulty in that "there was no finding by the board with respect to the cost of compliance with the requirements of the fire and building codes, the valuation of the unused and unusable basement space, or the conversion of non-cash sales to their cash equivalents." Applicant stresses these were key issues at the hearing.

As regards the Redwood hearing, applicant states that similar issues of comparability were raised but again no specific findings were rendered.

Applicant concludes that instead of specific findings the board relied upon "boiler plate" findings so general that they are useless to the reviewing court.

The lower court found, with one exception, that the "Board made findings on all material issues," that it was "not required to make findings on all facts concerning which a conflict may arise," and that the findings the Board made "were sufficient to demonstrate the basis of the determination and to permit fair judicial review." The one exception was regarding the Redwood case, the lower court stating that in that case, "It cannot be determined whether or not the Board's determination of market value was based in part upon value to the owner for a particular use." The Redwood case was therefore remanded on that issue and no party has contested that part of the trial decision.

Under section 1611.5 (formerly § 1605.5) Revenue and Taxation Code the findings "shall fairly disclose the board's determination of all material points raised by the party in his petition and at the hearing including a statement of the method or methods of valuation used in appraising the property." Rule 324(e) requires the same.[6]

█ In the Redwood case (parking area property) the board made a finding on the bare land value based on "an analysis of sales of comparable properties," a finding on the "value for constructed improvements" based on "a cost approach to valuation," and a finding that

---

[6]California Administrative Code, title 18, section 324(e).

"the methods of valuation used in determining the full cash value of the taxpayer's property were and are the comparable sales approach to valuation, the cost approach, historical and replacement, and the income approach."[7]

Implicit in this finding is a finding that in using comparable properties the adjustments required by the statutes and rules were made.

In the Midstate case (Covell Hotel property) the board's findings include findings that comparable sales reported by the assessor placed the property within a certain range, that an income analysis of such comparable sales developed specified gross rent multipliers ranging from 110 to 117, or gross rate of return percentage figure of approximately 10 percent, "indicating a subject property value higher than that recommended by the Assessor, but, with adjustment downward for deferred maintenance and repair cost, supporting the Assessor's recommended finding of value." The findings also include a valuation of the building improvement reached by a replacement cost analysis by the assessor, application of a "percentage good" figure of 28 percent, giving a building value of $235,000 added to a land value of $215,000, plus fixed theatre improvements of $15,000, and personal property at $47,850. The board also found that the "[a]ssessor, in his valuation, has given due consideration to the condition of the building and need for repair and remodelling"; and that the comparable sales relied on by the assessor "appear to be sufficiently comparable that the prices realized for the properties sold may be fairly considered as shedding light on the value of the subject property." A specific finding as to full cash value and assessed value was made and the findings included a finding that "[t]he method of valuation used in determining the full cash value of the taxpayer's property was and is the income method, checked against replacement cost."[8]

In a recent zoning case, the California Supreme Court stated:

". . . [T]he agency which renders the challenged decision must set forth findings to bridge the analytic gap between the raw evidence and ultimate decision or order. . . .

"
.    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

---

[7]Redwood board of equalization hearing, findings, exhibit No. 2 in hearing before the trial court.

[8]Midstate board of equalization hearing, findings, exhibit No. 12 in hearing before the trial court.

"Among other functions, a findings requirement serves to conduce the administrative body to draw legally relevant sub-conclusions supportive of its ultimate decision; . . ." (*Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506, 515, 516 [113 Cal.Rptr. 836, 522 P.2d 12].)

While the findings do not cover every evidentiary matter pressed by applicant, they meet the fundamental requirements of *Topanga,* that "findings enable the reviewing court to trace and examine the agency's mode of analysis." (*Topanga Assn. for a Scenic Community* v. *County of Los Angeles, supra,* 11 Cal.3d at p. 516.)

As stated in *Hadley* v. *City of Ontario* (1974) 43 Cal.App.3d 121, 128 [117 Cal.Rptr. 513], decided after *Topanga,* "We do not mean to hold that formal findings of fact, such as would be prepared by a court, must be entered."

We hold that the findings as entered sufficiently comply with the requirements of section 1611.5 and rule 324(e). However, since the case will again be heard by the board, we point out that findings would be more helpful to the parties and to a reviewing court if they included a finding on whether the adjustments called for in rules 4 and 6 were in fact made, rather than merely "considered."

The judgment in each case is reversed with directions to the trial court to remand these matters to the Stanislaus County Board of Equalization for new hearings in accordance with due process of law and the views expressed herein.

Gargano, Acting P. J., and Franson, J., concurred.