[Civ. No. 15749. Third Dist. Dec. 3, 1976.]

FRED H. DRESSLER et al., Plaintiffs and Appellants, v.
COUNTY OF ALPINE et al., Defendants and Respondents.

558

## COUNSEL

David Warner Hagen and Guild, Hagen & Clark for Plaintiffs and Appellants.

Thomas M. Kelly, District Attorney, for Defendants and Respondents.

## OPINION

**FRIEDMAN, J.**—Plaintiffs are property taxpayers in Alpine County. They paid taxes under protest and filed four separate refund actions in the superior court, which entered a judgment denying relief in all four actions. The taxpayers appeal.

*Necessity for notice of revaluation
by State Board of Equalization*

■ In action No. 312 plaintiffs object to the assessment of their properties for the 1970-1971 tax year, charging deprivation of notice-and-hearing opportunities guaranteed by due process of law and by statute. According to unchallenged findings of the trial court, plaintiffs' properties were assessed by the county assessor and plaintiffs had opportunity to challenge this valuation; later, the State Board of Equalization increased the valuation of all property on the secured Alpine County tax roll for 1970-1971; the tax roll, as increased by the State Board of Equalization, was filed after the regular assessment period had closed. Plaintiffs received no personal notice of the action of the State Board of Equalization.

In particular plaintiffs complain of noncompliance with former section 1604.1 (now § 1605) of the Revenue and Taxation Code, which at the time in question declared: "An assessment made outside of the regular assessment period is not effective for any purpose, including its review, equalization and adjustment by the Board of Equalization, until the assessee has been notified thereof personally . . . ."[1] They contend that the action of the State Board of Equalization was an assessment made outside the regular assessment period within the scope of the statute, thus ineffectual for lack of personal notice to the taxpayers.

Plaintiffs' constitutional and statutory complaints have no merit. ■ Due process is satisfied if notice and an opportunity to question the validity or the amount of the tax is provided at some stage in the proceeding. (*People* v. *Skinner,* 18 Cal.2d 349, 355 [115 P.2d 488, 149 A.L.R. 299].) It does not guarantee taxpayers an opportunity to object to intercounty equalization orders of the state board. (*Bi-Metallic Investment Co.* v. *State Bd. of Equalization,* 239 U.S. 441 [60 L.Ed. 372, 36 S.Ct. 141].)

Section 1605 requires personal notice of assessments "made outside of the regular assessment period" in order to provide an opportunity for review of penal and escape assessments imposed after the regular

---

[1]Statutory citations in this opinion will refer to the Revenue and Taxation Code unless otherwise noted. In 1974 section 1604.1 was renumbered as section 1605 and the pertinent portion amended to read: "An assessment made .outside of the regular assessment period is not effective for any purpose, including its review, equalization and adjustment by the county board, until the assessee has been notified thereof personally . . . ."

adjustment roll has been completed. (See §§ 501-505, 531-535, 1611; Ehrman & Flavin, Taxing Cal. Property, §§ 263, 473.) ██ The statute deals solely with local (county) equalization of assessments.

The State Board of Equalization, in contrast, engages in intercounty equalization; it acts upon the entire county roll, adjusting it to achieve intercounty conformity; it does not "assess" individual properties. (Cal. Const., art. XIII, § 18; § 1821; *Davis* v. *Pacific Improvement Co.,* 137 Cal. 245, 252 [70 P. 15]; *Wells Fargo & Co.* v. *State Bd. of Equalization,* 56 Cal. 194, 196-199; see also, Gould, The Cal. Tax System, West's Annot. Rev. & Tax. Code, p. 105.) ██ Its action is not an "assessment made outside of the regular assessment period" within the meaning of section 1605.[2]

The trial court correctly denied relief in action No. 312.

### Taxability of Grazing Rights on Federal Land

██ In action No. 326 the trial court sustained the county's imposition of 1971-1972 property taxes on possessory interests consisting of cattle-grazing rights on seven parcels of United States Forest Service land.

The Forest Service land is snowbound and unavailable for grazing until about June of each year. Thus the Forest Service did not actually issue annual grazing permits to plaintiffs until sometime after March 1, the "lien date" for California property taxes.[3] Plaintiffs had no written grazing permits for these parcels on March 1, 1971, nor a legally enforceable right to receive them.

██ Possessory interests of private persons in federally owned property constitute a species of taxable property. (*Kaiser Co.* v. *Reid,* 30 Cal.2d 610, 618 [184 P.2d 879].) By statute, a possessory interest includes "[p]ossession of, claim to, or right to the possession of land . . . ." (§ 107, subd. (a).) Private and government contracts and permits create such a variety of interests that the boundaries of possessory interest definitions

---

[2]As we view it, the 1974 amendment of section 1605 (see fn. 1, *ante*), eliminating the reference to "Board of Equalization" and substituting "county board," was designed only for clarification and to eliminate any possibility that the reference to "Board of Equalization" might be construed to apply to the State Board of Equalization.

[3]The lien date, of course, is March 1 preceding the fiscal year for which taxes are levied. (§§ 117, 2192.)

cannot be precisely fixed; whether a particular interest is a taxable possessory one is a question for case-by-case resolution; the principal factors are exclusiveness, independence, durability and private benefit. (*Wells Nat. Services Corp.* v. *County of Santa Clara,* 54 Cal.App.3d 579, 583 [126 Cal.Rptr. 715].)

In *Board of Supervisors* v. *Archer,* 18 Cal.App.3d 717, 725-726 [96 Cal.Rptr. 379], this court held that grazing permits on federal land, although temporary and revocable, endow the permittee with possession and valuable use sufficient to create a possessory interest. Plaintiffs rely heavily on a dictum in a footnote of the *Archer* opinion. There we declared: "It is claimed that some of the permits are not granted until after the first Monday in March. If a person did not own a permit on that date, he obviously could not be taxed." (*Id.* at p. 725, fn. 1; see Ehrman & Flavin, *op. cit.* (June 1976 Supp.) § 50, p. 33, notes 13.3, 13.4.)

The *Archer* footnote deals with the durability factor in possessory interest determinations; that factor, in turn, evokes consideration of the recurrent character of federal grazing permits. Here the trial court found that plaintiffs had been granted annual permits for these same parcels for many years prior to 1971 and would continue to receive these same permits in the future so long as they put them to yearly use. The parties do not tell us whether the element of recurrency rests upon custom or upon an articulated renewal policy of the Forest Service. The taxpayers, at any rate, do not challenge these findings. Their legal position vis-a-vis these grazing permits differs from that of grazing permittees generally only as regards the annual issue date.

Plaintiffs' grazing permits are assets of economic value just as are those issued before March 1. Plaintiffs' grazing rights differ physically but not legally from the latter. Plaintiffs graze their cattle at high altitudes which are snowbound on March 1; other permittees utilize grazing lands at lower altitudes, thus needing and receiving their Forest Service permits by March 1. Within the span of each annual grazing season, plaintiffs' grazing privilege has relatively brief duration. This curtailment may bear on valuation but not on taxability. Relative to the element of year-by-year recurrence, plaintiffs' grazing privileges are just as durable as those based on permits issued before March 1. A history on March 1 of recurrent use and possession is just as significant as an interval of use and possession which actually embraces the lien date.

In the exercise of its statutory authority to adopt regulations promoting statewide uniformity among assessors (Gov. Code, § 15606), the State

Board of Equalization has adopted a regulation describing its own concept of the durability factor.[4] Subdivision (b)(2) of the rule, quoted in the margin, recognizes that a history on the lien date of recurrent use and possession may satisfy the element of continuity even though the span of actual possession and actual use may not include the lien date. ■ Although not binding, the state board's authoritative expression is entitled to deference. (*Ralphs Grocery Co.* v. *Reimel,* 69 Cal.2d 172, 179 [70 Cal.Rptr. 407, 444 P.2d 79].) The board's view reinforces our own—that a history on the lien date of recurrent use is just as significant as the annual time span of use.

The present discussion leads to a reappraisal of our footnote in *Board of Supervisors* v. *Archer, supra.* Suffice it to say that the *Archer* footnote gave no consideration to the element of annual recurrence; it has no application where there is a prior history of annual permits and an expectation of future annual permits.

As to the other factors of possessory interest determination—exclusiveness, independence and private benefit—suffice it to say that these were discussed in *Archer, supra,* 18 Cal.App.3d at pages 724-727. There they formed the basis for a conclusion that private grazing permits on federal land are taxable as a matter of law. Plaintiffs' expectation on March 1 that their grazing permits would be issued later in the season endowed them with a "claim to possession" in the sense that their application would receive its customary, annual recognition by the Forest Service. Thus on March 1 they owned a possessory interest as defined by section 107, subdivision (a).

### Valuation of Mountain Properties

Plaintiffs own 33 mountain parcels which they use only for summer grazing of livestock. After their assessments had been increased, they

---

[4]In title 18, California Administrative Code, section 22, the board declares: "(a) The continuity of possession or exclusive use necessary to establish a possessory interest will vary according to the location and character of the property. The continuity of use necessary for finding a possessory interest to exist is satisfied when the possessor of the property uses it to substantially the same extent as would an owner engaged in the same activity.

"(b) Standards for determining the existence of taxable possessory interests based on continuity are:

"(1) Actual or constructive possession or exclusive use of property on the lien date for the current year.

"(2) Recurrent possession or exclusive use, whether or not the period extends through the lien date, when there is a history on the lien date of recurring use by the present or former possessors making a similar use of the property."

appeared before the county board of supervisors, sitting as a board of equalization, protesting the increased valuations. Equalization hearings in 1971 and 1972 resulted in affirmation of most of the assessor's valuations. Plaintiffs paid taxes under protest and in actions Nos. 336 and 354 sought refunds. The trial court concluded that the county appraisals were proper and denied relief.

██ Plaintiffs contend that the county officials erred by applying the comparative sales method of valuation without conducting any comparison of the actual and potential uses of the taxpayers' property and the properties sold. We sustain that contention.

██ The law presumes that assessment officers have properly performed their duties and consequently that assessments are regularly and correctly made. (*Midstate Theatres, Inc.* v. *County of Stanislaus,* 55 Cal.App.3d 864, 879 [128 Cal.Rptr. 54]; *Griffith* v. *County of Los Angeles,* 267 Cal.App.2d 837, 842 [73 Cal.Rptr. 773].) When a taxpayer-plaintiff claims that the assessor and the county board have erroneously applied a valid method of property valuation, the courts will overturn the decision only when no substantial evidence supports it; when the plaintiff challenges the validity of the valuation method itself, the courts are faced with a question of law. (*Bret Harte Inn, Inc.* v. *City and County of San Francisco,* 16 Cal.3d 14, 23 [127 Cal.Rptr. 154, 544 P.2d 1354]; see generally, Ehrman & Flavin, *op. cit.* (June 1976 Supp.) § 498.)

At the times in question California law required that property be assessed for taxation at its full cash value. (Cal. Const., former art. XI, § 12; Rev. & Tax. Code, former § 110; cf. Cal. Const., art. XIII, § 1, enacted in 1974; Rev. & Tax. Code, § 401.) The requirement was interpreted to provide for assessment " 'at the price that property would bring to its owner if it were offered for sale on an open market under conditions in which neither buyer nor seller could take advantage of the exigencies of the other.' " (*Bret Harte Inn, Inc.* v. *City and County of San Francisco, supra,* 16 Cal.3d at p. 21, quoting from *De Luz Homes, Inc.* v. *County of San Diego,* 45 Cal.2d 546, 562 [290 P.2d 544].)

Since 1967, State Board of Equalization assessment standards, adopted under the authority of Government Code section 15606, have codified the various appraisal methods, postulating the comparative sales approach as the preferred method when reliable market data are available. (Cal. Admin. Code, tit. 18, §§ 3, 4.)

In 1969 the elements of comparability entailed in the comparative sales approach were codified as section 402.5 of the Revenue and Taxation Code. That statute declares: "When valuing property by comparison with sales of other properties, in order to be considered comparable, the sales shall be sufficiently near in time to the lien date, and the properties sold shall be located sufficiently near the property being valued, and shall be sufficiently alike in respect to character, size, situation, usability, zoning or other legal restriction as to use unless rebutted pursuant to Section 402.1, to make it clear that the properties sold and the properties being valued are comparable in value and that the cash equivalent price realized for the properties sold may fairly be considered as shedding light on the value of the property being valued. 'Near in time to the lien date' does not include any sale more than 90 days after the lien date."

The comparability factors enumerated in section 402.5 are similar to those applied in eminent domain valuation. (See *County of Los Angeles* v. *Faus*, 48 Cal.2d 672, 678 [312 P.2d 680].) ■ In property valuation generally, the factor of usability entails a consideration of all the uses to which a parcel is adapted, not merely the owner's current use; the highest and most profitable use is to be considered to the extent that the prospect of that use affects the market value of the land; uses which are not reasonably probable should be excluded. (*People* v. *Ocean Shore Railroad*, 32 Cal.2d 406, 425-426 [196 P.2d 570, 6 A.L.R.2d 1179]; *Sacramento Southern Railroad Co.* v. *Heilbron*, 156 Cal. 408, 412 [104 P.2d 979].)[5]

In parallel fashion rule 4 of the State Board of Equalization directs an assessor using a comparative sales approach to "[m]ake such allowances as he deems appropriate for differences . . . in physical attributes of the properties, location . . . and the income and amenities which the properties are expected to produce." (Cal. Admin. Code, tit. 18, § 4, subd. (d).)

■ Plaintiffs' parcels were at elevations ranging between 6,000 and 8,800 feet. They possessed varying topographic characteristics; they contained gently and moderately sloping and steep areas. The terrain included meadow, brushland, rocky hillsides, gullies and cliffs. Some

---

[5]The decisional guide to valuation which equates "highest" with "most profitable" use was evolved before the advent of legislation designed to protect open-space and environmentally restricted lands from conventional tax valuation methods. (See Cal. Const., art. XIII, § 8; Rev. & Tax. Code, §§ 402.1, 421-432; Gov. Code, § 51200 et seq.)

parcels were accessible by highway, others by dirt road, others only on foot or horseback. According to plaintiffs' evidence, they used their properties only for summer grazing and had no other prospective uses; they placed a value of $45 to $75 per acre on these lands. The assessor's valuations, in contrast, ranged from $100 to $775 per acre. Neither plaintiffs nor the assessor presented any evidence of actual or potential use of plaintiffs' lands other than for summer grazing of livestock.

At the equalization hearings, the assessor presented evidence of seven sales occurring between 1964 and 1969 which he believed to be comparable. In area, the sales aggregated about 3,360 acres. A classification by topography formed the prime basis for the assessor's comparisons. He classified the sold properties as steep, moderate (i.e., moderately sloping) and gentle (i.e., gently sloping or rolling). He then applied the sales prices per acre to topographically comparable land of the taxpayers. Three small sales of steep land (aggregating 160 acres) had occurred at $75 or $100 per acre. The other four sales (aggregating about 3,200 acres) were rated at $400 to $575 per acre for moderately sloping land and at $650 to $780 per acre for gently sloping land. Three of the four sales (involving 2,885 of the 3,200 acres) had been bought for incorporation within recreational and skiing developments; increased installation costs and interest rates had thus far frustrated these developments.

Acting upon the evidence of these seven sales, the local board in 1971 gave values of $75 and $100 per acre to the taxpayers' steep and inaccessible lands, but valued other parcels at $400 to $700 per acre. The board fixed an aggregate cash value of $2,431,500 on the 33 parcels. At its 1972 hearing the board viewed the identical seven sales as indicators of value. In 1972 the board kept a number of the appraisals at the 1971 levels but lowered others. Although the valuation evidence at the 1971 and 1972 hearings was identical, the board in 1972 fixed an aggregate cash value of $1,804,150 on the 33 parcels, a sum approximately $627,000 less than the 1971 aggregate value. The contrast between the two aggregate valuations is noteworthy, because (a) the 1971 as well as 1972 valuations are under attack, and (b) the board acted on the identical evidence in both years.

The record is devoid of evidence that any of plaintiffs' properties were adaptable to development and use comparable to that of the major "comparable" sales. No witness testified that any of plaintiffs' parcels possessed the characteristics, location and accessibility necessary for a

skiing development. To establish comparability the county relied solely upon evidence of topographic similarities. That evidence was quite inadequate to show similarity of potential use.

Indeed, the record of the hearing before the county board demonstrates the county's vigorous (albeit mistaken) refusal to indulge in usability comparisons. Both the county appraiser[6] and counsel for the county assessor[7] expressed resistance to evidence of these comparisons.

Consistently with its declared position but inconsistently with statute and rule, the county showed no use characteristics of the benchmark properties which would aid in establishing a palpable degree of comparability with plaintiffs' summer grazing properties. A mild exception occurred with respect to one comparable sale, an acquisition of 320 acres by the federal Forest Service. Apparently grazing was one of the uses for which the Forest Service acquired the property; its adaptability to other uses was not shown.

We do not construe section 402.5 as an inflexible demand for full satisfaction of all the statutory comparability criteria. As one court has pointed out, standards of comparability are not absolute. (*Midstate Theatres, Inc.* v. *County of Stanislaus, supra,* 55 Cal.App.3d at p. 880; cf. *Georgia-Pacific Corp.* v. *County of Butte,* 37 Cal.App.3d 461, 472 [112 Cal.Rptr. 327].) The statute demands only "sufficient [similarity] to make it clear" that the property sold may "fairly be considered" as bearing upon the assessment appraisal. Nevertheless, the presumption of propriety may not be inflated or the scope of judicial review deflated at the cost of statutory integrity. The legislature meant section 402.5 to be obeyed. In section 1613, it commands county boards of equalization and

---

[6]The following exchanges between counsel for plaintiff and the county appraiser at the 1971 equalization hearing are illustrative:

"[Question]: In no case do you then in any of the sales upon which you rely . . . did you make a determination of the highest and best use of the property sold. [Answer]: No, sir, I didn't. [Question]: In appraising this property you didn't take into account its highest and best use. [Answer]: I think as I've said before this Board before, I do not try to place a highest and best use on a particular parcel and I only look at the range of value that is established in the real estate market and weigh my judgment with that."

[7]Counsel for the assessor told the board: "Mr. Chairman, I would like to respond to Mr. Hagen's argument. I submit that the concept of highest and best use is not included in the definition of fair market value which governs an equalization proceedings . . . . Now at one time in the appraisal process it was accepted technique that the appraiser considered the highest and best use of the property arrived at an opinion of the highest and best use of the property and then determined his opinion of value for that highest and best use and confined his consideration to that. That is no longer the only or accepted technique for appraisal process."

assessment appeals boards to follow section 402.5. Similarly, in Government Code section 15606, it declares that the rules of the state board of equalization are to "govern" and that the statute itself is "mandatory."

Here, both sections 402.5 and State Board of Equalization rule 4 were violated by the failure of the assessor and local board to make use comparisons between the benchmark properties and the taxpayers' lands. Instead, they resorted to inadequate topographic catchwords —steep, moderate and gentle—as the prime basis of comparability. There is no assurance whatever that the sales in question could "fairly be considered" as evidence of the assessor's appraisal. ■ The lack of evidence of comparability obliterates the evidentiary foundation for the assessment.[8]

The misuse of topographic catchwords as the prime basis of comparability is pointed up by the valuation of several properties consisting largely of cliffs and gullies. At the 1971 equalization hearing the county's appraiser testified that he had found few sales under $100 per acre; that this was the minimal price he would put on any and all land in Alpine County. The local board apparently accepted his view, for it assessed plaintiffs' "steep" property at $100 per acre. There was no evidence of any use or any market for plaintiffs' cliffs and gullies. The comparative sales method of valuation rests upon the assumption that reliable market data concerning the taxed property are available. (Cal. Admin. Code, tit. 18, § 4.) ■ The market data approach presupposes that competition will endow a given property with a value equaling the sales price of a comparable property. (Ehrman & Flavin, *op. cit.,* § 316.) As applied to plaintiffs' cliffs and gullies, the county's attribution of a minimum $100 per acre value to all property within the county was arbitrary. That other "steep" land sold for $100 per acre was not substantial evidence that unsaleable cliffs and gullies had an equal value.

Plaintiffs contend that lack of evidence of comparability bars use of the comparative sales approach and demands utilization of the capitali-

---

[8]The county argues that the taxpayers failed to sustain their burden of establishing the value of their properties by independent evidence. An applicant for assessment reduction must establish the value of his property by independent evidence. (§ 1610.8.) Aside from the fact that expert appraisals are more persuasive, the taxpayer himself is competent to testify to the value of his own property. (*City of Pleasant Hill* v. *First Baptist Church,* 1 Cal.App.3d 384, 411 [82 Cal.Rptr. 1]; see also, Ehrman & Flavin, *op. cit.,* § 468.) Here the taxpayers not only gave their opinion of the market value of their own parcels but demonstrated that the county's appraisal did not comply with the law. The taxpayers fully satisfied their burden of proof.

zation of income method. Plaintiffs postulate a stream of income in terms of the annual value of grazing the quantity of cattle accommodated by the various parcels. The contention is inacceptable. ■ Of the five valuation approaches enumerated in the State Board of Equalization rules, assessors have discretion to select the one or several appropriate to the particular property. (Cal. Admin. Code, tit. 18, § 3; see *Bret Harte Inn, Inc.* v. *City and County of San Francisco, supra,* 16 Cal.3d at p. 21.). That substantial evidence of comparability was not produced at the county board hearing does not mean that none is available.

In actions Nos. 336 and 354 the judgments must be reversed in order to permit a remand to the county board for further hearings. (*Universal Cons. Oil Co.* v. *Byram,* 25 Cal.2d 353, 362-363 [153 P.2d 746].) ■ In view of the further hearings, one aspect of the 1972 equalization hearing deserves mention. The Assessor of Alpine County had placed a value of $100 per acre on one 40-acre tract accessible only by foot. The owners testified to a value of $25 per acre. In an effort to support his own appraisal, the county assessor testified that he himself "would be willing to write a check for $4,000 for the property." He admitted that he had never been on the property. The assessor's testimony was blatantly improper. If the offer was serious, it offended the principle of public policy which bars officials from having or acquiring a personal interest in their official transactions. (*Terry* v. *Bender,* 143 Cal.App.2d 198, 206-207 [300 P.2d 119]; *Noble* v. *City of Palo Alto,* 89 Cal.App. 47, 51 [264 P. 529].) If it was not serious, it was an irrelevant attempt to score a debating point. Had the county board been properly advised, this testimony should have been stricken.

The judgments in actions Nos. 312 and 326 are affirmed. The judgments in actions Nos. 336 and 354 are reversed with a direction to remand the equalization proceedings to the county board for completion according to the standards prescribed by law.

Puglia, P. J., and Paras, J., concurred.