[No. B040463. Second Dist., Div. Three. Mar. 16, 1990.]

*McDONNELL DOUGLAS CORPORATION, Plaintiff and Respondent, v.
COUNTY OF LOS ANGELES et al., Defendants and Appellants.

---

* Reporter's Note: This case was previously entitled "County of Los Angeles v. McDonnell Douglas Corp."

COUNSEL

De Witt W. Clinton, County Counsel, and Albert Ramseyer, Deputy County Counsel, for Defendants and Appellants.

Tuttle & Taylor, Alan E. Friedman and David B. Babbe for Plaintiff and Respondent.

OPINION

DANIELSON, J.—County of Los Angeles (County) and City of Long Beach (the City; collectively, defendants) appeal from a judgment in favor of McDonnell Douglas Corporation, Inc. (MDC). The effect of the judgment is to vacate the determination by the Los Angeles County Board of

Assessment Appeals (Board) that the land value of the subject property be assessed at $45,392,878, and to remand the matter for redetermination by the Board in accordance with the court's judgment.

We reverse the judgment.

## FACTUAL STATEMENT

### I. *Acquisition of the Subject Property*

Prior to December 1981, MDC leased certain real property consisting of about 135 acres (the property) from the City. MDC's leasehold interest in the property was 47 years. MDC's rental payments were "exceedingly low."

In December 1981, MDC exercised its option to buy the property. The purchase price was $15.5 million. The City's appraiser, however, opined that the fee interest, free and clear of leases, had a fair market value of about $22 million. The acquisition of the subject property by MDC involved a three-sided land swap.

MDC's acquisition of the subject property from the City constituted a "change of ownership" (see Rev. & Tax. Code, § 65.1), which caused the reassessment at issue.

### II. *Description of the Property*

The property is comprised of four large parcels, which the parties refer to as Conant East, Conant West, Wardlow North, and Wardlow South and consists, in sum, of ten assessor's parcels. Conant East is an approximately 29-acre rectangular parcel, and on December 24, 1981, the date of value, was being used for employee parking. Conant West, a rectangular parcel of about 50 acres, was also used for parking and for access roadways for automobiles and aircraft, with an aircraft storage and testing area on the westerly portion of the property. Wardlow North, a rectangular tract about 25 acres, was improved with an aircraft related industrial building. Wardlow South, a rectangular parcel of about 31 acres, was improved with a large aircraft assembly building that was used for maintenance and storage.

### III. *Restrictions*

#### A. *Zoning*

As of the date of value, Conant East was zoned R-1-N, which permitted detached single-family residences and prescribed a maximum building

height of 30 feet. The employee parking use of the parcel existed by virtue of a special use permit issued in February 1956, which created the use in perpetuity. Conant East was a poor site for residential use because of its proximity to a large manufacturing facility and also to an airport runway. It was unlikely that airport regulatory authorities would ever have allowed residential housing adjacent to a runway approach zone.

Conant West, Wardlow North, and Wardlow South were all zoned MG as of the date of value. The MG zoning permitted most commercial and industrial uses, not just aircraft-related use, and prescribed a building height limit of 45 feet.

### B. *Deed Restrictions*

As of the date of value, the entire property was burdened by deed restrictions. These included restrictions limiting the use of the property with respect to aircraft-related activities[1] and burdening the property with a right of first refusal in favor of the City in the event of the sale of any of the property.

### C. *FAR parts 77 and 152 Building Height and Building Area Restrictions*

On the date of value, FAR part 152 and related restrictions made applicable to the property by the City's grant deeds, prohibited the building of any structure on 43 percent of Conant West. Parts 77 and 152 required about four acres of Conant East to be maintained as a runway clear zone. Part 77 height restrictions limited building heights to as low as 22 feet at the southwest corner of Conant East.

### STATEMENT OF THE CASE

In December 1981, the assessor found that the highest and best use of the property was for aviation purposes, and based on such use, estimated the land value of the subject property to be $49,092,173.

---

[1] These restrictions consisted of: (1) A restriction limiting use of the property to aircraft-related manufacturing and support activities so long as the City or any other governmental agency operated or maintained an airport abutting the property; (2) an aviation easement permitting the public to overfly the property and to subject the property to aircraft noise; (3) the requirement of a runway clear zone applicable to runways 34R-16L and 25R pursuant to parts 77 and 152 of the Federal Aviation Regulations (FAR); (4) an agreement not to build any structures in the extended runway safety areas of the clear zones or to build above the height limitations under FAR part 77; and (5) an agreement not to use the property in a manner which might constitute an airport hazard, such as interference with the landing or taking off of aircraft at Long Beach Municipal Airport.

MDC appealed that assessment to the Board. At the hearing MDC took the position that the assessor had failed to account adequately for the detriment to MDC's property value caused by the above restrictions. Following a three-day hearing, the Board found that the highest and best use of the subject property was for aviation purposes. The Board determined that the restrictions in question had a minimal effect on the property's value, especially in view of the property's highest and best use for aviation purposes. The Board analyzed and appraised the subject property as an economic unit, albeit, during the hearing, the Board had considered each parcel individually. The Board gave a value to each parcel based on the number of square feet each parcel contained and determined the value of the entire property to be $45,392,878.

MDC then appealed the Board's decision by filing an action in the superior court for refund of taxes against the County and a second action against the City. These actions were then consolidated for all purposes. In overturning the Board's decision the court made the following specific findings: (1) the Board improperly considered the property's value to MDC, instead of to the market place in general; (2) the Board failed to make value adjustments for restrictions, since its finding that the restrictions had a minimal effect on value was not supported by substantial evidence; and (3) the Board improperly applied a uniform value per square foot standard to subject property.

This appeal followed.

## ISSUES PRESENTED

Two basic issues are presented: (1) did the Board apply the proper valuation method; and, if so, (2) is the Board's value determination supported by the evidence?

## STANDARD OF REVIEW

"The law presumes that assessment officers have properly performed their duties and consequently that assessments are regularly and correctly made. [Citations.] When a taxpayer-plaintiff claims that the assessor and the county board have erroneously applied a valid method of property valuation, the courts will overturn the decision only when no substantial evidence supports it; when the plaintiff challenges the validity of the valuation method itself, the courts are faced with a question of law. [Citations.]" (*Dressler* v. *County of Alpine* (1976) 64 Cal.App.3d 557, 566 [134 Cal.Rptr. 554].)

"The questions of the legality of methods and substantial evidence are distinct. [Citation.] The substantial evidence issue involves: '. . . a review of the quantum of evidence before the board to support the board's factual determination of the value of the taxpayer's properties. [Citation.] In discharging its duty ". . . the board's determination upon the merits of the controversy is conclusive; the taxpayer has no right to a trial de novo in the superior court to resolve conflicting issues of fact as to the taxable value of his property. [Citations.] The question presented to the superior court in such an action is whether there was evidence of sufficient substantiality before the board to justify the finding . . . and . . . the board is the sole judge of questions of fact and of the values of property." [Citation.]' [Citation.]" (*Midstate Theatres, Inc.* v. *County of Stanislaus* (1976) 55 Cal.App.3d 864, 884-885 [128 Cal.Rptr. 54].)

"Like the trial court, the appellate court may not independently weigh the evidence, but must apply the substantial evidence rule. [Citation.] **(2)**, ▇▇▇ [' "[T]he term 'substantial evidence' should be construed to confer finality upon an administrative decision on the facts when, upon an examination of the entire record, the evidence, including the inferences therefrom, is found to be such that a reasonable man, acting reasonably, *might* have reached the decision . . . ." [Citation.]'] (Italics in original.)"[2] (*Dennis* v. *County of Santa Clara* (1989) 215 Cal.App.3d 1019, 1026 [263 Cal.Rptr. 887].)

Issues relating to the propriety of the valuation method "are reviewable for 'arbitrariness, abuse of discretion, or failure to follow the standards prescribed by the Legislature' [citations]." (*Midstate Theatres, Inc.* v. *County of Stanislaus, supra*, 55 Cal.App.3d 864, 878.)

### DISCUSSION

It is undisputed that the comparable sales approach is a proper, and in this instance an appropriate method to establish the value of the property. The controversy concerns the manner in which that approach was utilized in the present case.

MDC took the position before the trial court that the Board erred by failing to make value adjustments for the restrictions limiting the use of the property. In sum, MDC argued that the Board was required to make such

---

[2] The record reflects that the trial court erred by relying on the facts set forth in the briefs instead of reading the administrative record and by relying on evidence outside that record, i.e., the declaration of Ronald B. Welch. We conclude, however, such errors were nonprejudicial inasmuch as we conduct an independent review of the administrative record.

adjustments under Revenue and Taxation Code[3] section 402.1 since there was no evidence presented to show that the restrictions had "a demonstrably minimal effect upon value." MDC further argued that the Board applied the wrong standard in finding that the restrictions did not adversely affect the value of the property as to MDC. The Board was required under section 110[4] to define fair market value in terms of an arm's-length buyer, not to a particular buyer.

MDC further argued the Board erred by assessing the property as an economic unit instead of taking into account the effect of restrictions on each parcel. MDC also argued that the evidence did not support the Board's finding that the restrictions had a minimal effect on the property's value.

From our review of the entire record and the applicable law, we conclude the Board applied the appropriate valuation method correctly and its findings are supported by substantial evidence. Accordingly, we find the appeal of the City and County from the judgment overturning the Board's determination to be well taken.

I. *Applicable Legal Principles*

"Article XIII, section 1, subdivision (a), of the California Constitution provides that all property 'shall be assessed at the same percentage of fair

---

[3] All further section references are to the Revenue and Taxation Code unless otherwise specified.

Section 402.1 provides in pertinent part: ". . . In the assessment of land, the assessor shall consider the effect upon value of any enforceable restrictions to which the use of the land may be subjected. These restrictions shall include, but are not limited to all of the following: [¶] (1) Zoning. [¶] (2) Recorded contracts with governmental agencies other than those provided in Section 422. [¶] (3) Permit authority of, and permits issued by, governmental agencies exercising land use powers concurrently with local governments . . . .

". . . In assessing land . . . the assessor shall not consider sales of otherwise comparable land not similarly restricted as to use as indicative of value of land under restriction, unless the restrictions have a demonstrably minimal effect upon value. . . .

". . . For the purposes of this section the following definitions apply:

"(1) 'Comparable lands' are lands which are similar to the land being valued in respect to legally permissible uses and physical attributes."

[4] Subdivision (a) of section 110 provides: "Except as is otherwise provided in Section 110.1, 'full cash value' or 'fair market value' means the amount of cash or its equivalent which property would bring if exposed for sale in the open market under conditions in which neither buyer nor seller could take advantage of the exigencies of the other and both with knowledge of all of the uses and purposes to which the property is adapted and for which it is capable of being used and of the enforceable restrictions upon those uses and purposes."

Section 110.1 provides, in pertinent part: "(a) For purposes of subdivision (a) of Section 2 of Article XIII A of the California Constitution, 'full cash value' of real property, including possessory interests in real property, means the fair market value as determined pursuant to Section 110 for . . . [t]he date on which a purchase or change in ownership occurs."

market value.' 'Fair market value' or 'full cash value' is 'the appraised value of real property when . . . a change in ownership has occurred after the 1975 assessment.' (Cal. Const., art. XIII A, § 2, subd. (a).) 'Full cash value' is also statutorily defined as, 'the amount of cash or its equivalent which property would bring if exposed for sale in the open market under conditions in which neither buyer nor seller could take advantage of the exigencies of the other and both with knowledge of all of the uses and purposes to which the property is adapted and for which it is capable of being used and of the enforceable restrictions upon those uses and purposes.' (Rev. & Tax. Code, § 110.)" (*Dennis* v. *County of Santa Clara, supra,* 215 Cal.App.3d 1019, 1026.)

■ "[R]egardless of the specific conditions affecting the value of the property to the individual owner, the assessment method for property tax purposes must be objective." (*Carlson* v. *Assessment Appeals Bd. I* (1985) 167 Cal.App.3d 1004, 1011 [213 Cal.Rptr. 555].)

" 'In estimating value . . . the assessor shall consider one or more of the following, as may be appropriate for the property being appraised: [¶] (a) The price or prices at which the property and comparable properties have recently sold (the comparative sales approach).' (Cal. Code Regs., tit. 18, § 3.) ■ '[M]arket data on recent sales of the property to be assessed and comparable properties, when such data is available, is the most accurate way of arriving at the assessed value of the property. [Citations.]' [Citation.]" (*Dennis* v. *County of Santa Clara, supra,* 215 Cal.App.3d 1019, 1031.)

" 'When valuing property by comparison with sales of other properties, in order to be considered comparable, the sales shall be sufficiently near in time to the lien date, and the properties sold shall be located sufficiently near the property being valued, and shall be sufficiently alike in respect to character, size, situation, usability, zoning or other legal restriction . . . to make it clear that the properties sold and the properties being valued are comparable in value and that the cash equivalent price realized for the properties sold may fairly be considered as shedding light on the value of the property being valued." [§ 402.5.]

■ "The comparability factors enumerated in section 402.5 are similar to those applied in eminent domain valuation. [Citation.] In property valuation generally, the factor of usability entails a consideration of all the uses to which a parcel is adapted, not merely the owner's current use; the highest and most profitable use is to be considered to the extent that the prospect of that use affects the market value of the land; uses which are not reasonably

probable should be excluded. [Citations.] [¶] In parallel fashion rule 4 of the State Board of Equalization directs an assessor using a comparative sales approach to '[m]ake such allowances as he deems appropriate for differences . . . in physical attributes of the properties, location [, legally enforceable restrictions on the properties' use,] and the income and amenities which the properties are expected to produce.' (Cal. [Code Regs.,] tit. 18, § 4, subd. (d).)" (*Dressler* v. *County of Alpine, supra,* 64 Cal.App.3d 557, 567, fn. omitted.)

"Standards of comparability [,however] can never be treated in absolute terms. Even relatively poor data can 'fairly be considered as shedding light on the value of the property being valued.' (Rev. & Tax. Code, § 402.5) if it is the best or only data available." (*Midstate Theatres, Inc.* v. *County of Stanislaus, supra,* 55 Cal.App.3d 864, 880.)

". . . In the assessment of land, the assessor shall consider the effect upon value of any enforceable restrictions to which the use of the land may be subjected. . . . [T]he assessor shall not consider sales of otherwise comparable land not similarly restricted as to use as indicative of value of land under restriction, unless the restrictions have a demonstrably minimal effect on value." (§ 402.1; see also rule 4, State Board of Equalization Rules, Cal. Code Regs., tit. 18, § 4.)

## II. *Validity of Valuation Method*

### A. *Highest and Best Use of the Property for Aviation Purposes*

■ Contrary to MDC's claim otherwise, the Board did not assess the property in relation to its unique value to MDC instead of its general value in the market place. The Board did find that the restrictions and regulations affecting the use of the property constituted "an enhancement and a benefit to the nature of [MDC's] operation at the airport as a peculiarly suitable locationwise because [MDC] was operating under those conditions for years and will continue to do so for years." However, the Board was making that finding in conjunction with its conclusion that "the highest and best use at the time of purchase" of the property was for aviation industrial purposes. The Board was entitled to consider the prior and current use of the property in making its determination of the highest and best use of the property. (See § 110.)

Accordingly, when viewed in context, it is clear that the Board was not basing its decision not to take into account the restrictions on the property because of the property's peculiar or particular value to MDC. Instead, the

Board reasoned that such restrictions did not adversely affect the highest and best use of the property, which was for aviation industrial purposes, and which happened to be the use of the property which MDC made and would continue to make of the property. (Cf. *Pacific Mutual Life Ins. Co.* v. *County of Orange* (1985) 187 Cal.App.3d 1141, 1146 [232 Cal.Rptr. 233].)

B. *Valuation of the Property As an Economic Unit*

■ MDC also claimed the Board violated rule 4 of the State Board of Equalization Rules by failing to adjust the values obtained from the comparable sales based on each of the restrictions limiting the use of the property.

We find no violation.

The record reveals the Board considered each of the four parcels, i.e., Conant East, Conant West, Wardlow North, and Wardlow South individually prior to determining the full cash or fair market value of the property, as a unit, to be $45,392,878. The Board reasoned that the four parcels comprising the property did not have individual, separate functions as such; instead, they constituted components of a single entity, i.e., an aviation plant. The Board found that the subject restrictions, e.g., aviation easements, clear zones, and limiting the use of the property to aircraft-related manufacturing and related modification and support activities, therefore had a demonstrably minimal effect on the value of the property. Since the restrictions did not affect the value of the property in any appreciable fashion, the Board was not required to make special, individual adjustments based on each restriction. (Cf. *Midstate Theatres, Inc.* v. *County of Stanislaus, supra*, 55 Cal.App.3d 864, 880-881.)

At the hearing before the Board MDC espoused the theory that a discount formula should be utilized to apportion the appropriate value to the property's components based on the nature and effect of each restriction on such component. In other words, as the Board pointed out, "a parcel as an economic whole or package was separated and divided into component sections with the land used for parking given one value, the easement area another value, and the portions of land upon which the improvements stand also had different values depending on which portion of the improvements had future buildability height restrictions."

The Board rejected this approach as "not an acceptable methodology in determining market value of a parcel." The Board reasoned: "Allocations for land and improvements on a parcel has merit, but to separate, fragmentize and allocate sections of a large parcel upon which portions of the

improvements stand, such as giving a higher or lower value *to that portion* of land that the one story building stands upon and another value to that portion of the land that two stories of the building stands upon, as offered by the applicant in its component and discount approach, is in the judgment of the Board lacking in merit and unwarranted."

We agree with the Board's characterization of such a "component value" approach as not being an acceptable methodology. No applicable authority has been cited, nor have we found any authority to support such a valuation method, which defies common sense and is not practical or feasible. We therefore conclude the Board did not err in applying a uniform value per square foot standard in assessing the property.

III. *Substantial Evidence Supports the Finding That the Restrictions Had a Demonstrably Minimal Effect on Value*

At the hearing the Board had before it evidence of comparable sales from both the assessor and MDC. The assessor's appraiser, Arturo Cuevos (Cuevos), based his opinion of the value of the property at $49,092,173 by comparison of three comparable sales properties. J. Pearce Cashman (Cashman), one of MDC's experts, based his opinion of the property's value at $22,935,000 on eight comparable sales set forth in an appraisal conducted by Laventhol & Horwarth. MDC's other expert, Ronald L. Buss (Buss), valued the property at $22,450,000 based on five comparable sales in an appraisal conducted by Landaur. The property located at Carson and Paramount in Lakewood, which consisted of 18.02 acres and was sold in February 1981, for $6,279,000, or $8 per square foot, was chosen as a comparable sale property by all three appraisers.

The disparity in value placed on the property by the appraisers is the result of how each appraiser took into account the restrictions on the subject property and the choice of the properties identified as comparable sales. Both of MDC's appraisers made adjustments in the value of the property based on the restrictions on the property. The Board, on the other hand, did not consider the restrictions in placing a value on the property.

From our review of the record we find ample evidence to support the Board's finding that the restrictions on the property had a demonstrably minimal effect on the value, and thus, should not be considered in its valuation of the property.

It is undisputed, for instance, that there is no reasonable probability that residential housing could be built on the Conant East parcel. Accordingly,

the building height restriction of 30 feet on single-family residences has no impact on the value of the property. The fact that Conant East is utilized solely for employee parking does not per se constitute a factor affecting the value of the property in a negative way. No evidence was presented to show whether and how such use of Conant East either added or detracted from its value. Cashman, MDC's own expert, conceded that the highest and best use of Conant East is to continue its use for parking. Buss, MDC's other expert, conceded that the highest and best use of Conant West was for aviation, manufacturing and related uses, which could include parking.

Cashman further conceded that the deed restrictions, e.g., limiting use of the property to aircraft-related manufacturing and related modification and support activities, had a minimal effect on the property's value except the height restrictions.

We agree with the Board's determination that the height restrictions imposed by the deed, as well as by zoning, have a demonstrably minimal effect on the value of the property. These height restrictions are imposed for the most part, to ensure safety of the public with respect to the operation of aircraft over the property, which is adjacent to the Long Beach Airport. Such restrictions constitute a trade-off when viewed in conjunction with the property's best and highest use, i.e., aviation industry purposes.

## DECISION

The judgment is reversed. Appellants to recover costs on appeal.

Klein, P. J., and Arabian, J., concurred.

A petition for a rehearing was denied April 13, 1990, and respondent's petition for review by the Supreme Court was denied May 31, 1990. Arabian, J., did not participate therein.