[No. B009475. Second Dist., Div. Seven. Dec. 12, 1986.]

THOMAS T. NOGUCHI, Plaintiff and Appellant, v.
CIVIL SERVICE COMMISSION OF LOS ANGELES COUNTY et al.,
Defendants and Respondents.

**COUNSEL**

Godfrey Isaac, Daniel M. Toll and Martin R. Berman for Plaintiff and Appellant.

Skadden, Arps, Slate, Meagher & Flom, William A. Masterson and Harriet S. Posner for Defendants and Respondents.

**OPINION**

**MACKEY, J.**\*—This is an appeal by appellant Thomas T. Noguchi, M.D. (Dr. Noguchi) from a judgment denying a peremptory writ of mandate.

By mandate petition, Dr. Noguchi sought judicial review of the action of respondent civil service·commission (Commission) in denying his appeals from the County's disciplinary action against him of a 30-day suspension and removal from his position as chief medical examiner-coroner.

I

STATEMENT OF RELEVANT FACTS

For approximately 25 years Dr. Noguchi has held a permanent position with the County of Los Angeles (County) in the Chief Medical Examiner-coroner's Department of the County of Los Angeles (Department). In 1967 Dr. Noguchi was appointed to the position of Chief·Medical Examiner-coroner of the County of Los Angeles.

By letter dated March 12, 1982, the County notified Dr. Noguchi of its intent to suspend him without pay for 30 days from his permanent position

---

\*Assigned by the Chairperson of the Judicial Council.

of chief medical examiner-coroner effective March 19, 1982, on the grounds that: (1) the operations of the Department had been found to be seriously deficient; (2) Dr. Noguchi failed to inform the board of supervisors of the problems in the Department; (3) Dr. Noguchi's involvement in outside activities had deprived the Department of leadership; (4) Dr. Noguchi inappropriately delegated authority for medical functions to a professionally unqualified manager; and (5) Dr. Noguchi demonstrated poor judgment in public statements regarding celebrity deaths.

Thereafter by letter dated March 25, 1982, Peter F. Schabarum, Chairman of the Board of Supervisors, notified Dr. Noguchi that he would be suspended, without pay, from March 29, 1982, to and including April 27, 1982. The letter stated that the board of supervisors (Board) found Dr. Noguchi's response to its March 12, 1982, letter inadequate.

Meanwhile, at or about the time that the Board made its decision to suspend Dr. Noguchi, the Grand Jury of Los Angeles County made an independent audit of Dr. Noguchi's Department.

By letter dated April 16, 1982, from Supervisor Schabarum to Dr. Noguchi, the board of supervisors informed Dr. Noguchi of its intent to demote Dr. Noguchi from his permanent position of Chief Medical Examiner-coroner of Los Angeles County to the position of physician specialist, M.D., effective April 28, 1982. The grounds for the demotion were identical to those grounds set forth by the board of supervisors for the suspension of Dr. Noguchi with one exception. The board of supervisors included a charge against Dr. Noguchi that he had misused the power of his office regarding a request by Eli Lilly & Co. to gain access to the records of the Department for a scientific study.

By letter dated April 27, 1982, from Supervisor Schabarum to Dr. Noguchi, the board of supervisors notified Dr. Noguchi of his demotion from chief medical examiner-coroner to physician specialist, M.D., effective April 28, 1982. The board of supervisors voted four to one to demote Dr. Noguchi.

By letter dated May 6, 1982, Dr. Noguchi through his attorney Godfrey Isaac officially appealed his demotion and requested a hearing before the Commission.

Commencing on July 19, 1982 and concluding on November 5, 1982, the administrative hearing lasted a total of 19 days. The reporter's transcripts of the administrative hearing are in excess of 3,500 pages and in 20 separate volumes. Further, hundreds of pages of exhibits were offered and admitted

into evidence and considered by the hearing officer, Sara Adler. At the trial before Hearing Officer Adler, the County established that it had substantial good cause to take the action of suspension and removal against Dr. Noguchi.

Although stating Dr. Noguchi's problems in great detail, the hearing officer recommended against his removal, suggesting instead that the 30-day suspension serve as a "final warning" to him. Given the evidence of Dr. Noguchi's shortcomings, Commission rejected that recommendation and affirmed Dr. Noguchi's suspension and removal from office. Dr. Noguchi thereupon filed his petition for administrative mandate with the Los Angeles Superior Court.

After issue was joined, Dr. Noguchi moved the superior court for a peremptory writ.

As framed by Dr. Noguchi, the major issues for decision on the motion were whether the findings were supported by the evidence and whether there had been an abuse of discretion in the discipline imposed on him. Appellant made some "due process" claims that his rights have been violated by the denials of his motion before the Commission trial to disqualify both the hearing officer and counsel for respondent County.

The superior court (Norman Epstein, Judge) reviewed the entire record and made its independent judgment on the evidence. It ruled that the findings of the Commission were proper, supported by the evidence and that there had been no abuse of discretion in the discipline imposed on Dr. Noguchi.

The hearing before the superior court started on June 22, 1984, and lasted for less than one day. After the superior court pronounced its decision, Dr. Noguchi requested a written statement of decision per Code of Civil Procedure section 632. The superior court rejected the request as not timely, since made after pronouncement of decision rather than before submission as required by section 632. Thereafter, defendant appealed his case.

## II

### ISSUES PRESENTED FOR REVIEW

A. A claim that there is no substantial evidence to affirm his demotion;

B. A claimed lack of due process in various aspects of the proceedings before the Commission;

C. Alleged abuses of discretion by the County and the superior court with respect to his demotion.

### A. *Was There Substantial Evidence to Support Dr. Noguchi's Removal*

A review of the 39 findings by the 1976 management review indicated that there were "serious management deficiencies" in the Department in a number of respects.

Also, a management audit was performed by personnel of the county administrator officer's (CAO) staff and a panel of three outside experts, and a simultaneous review was done by the Los Angeles County Grand Jury.

Findings 11 and 12 were as follows: "11. The conclusions of the Management Audit and of the Grand Jury Review were that there were serious deficiencies in the space, number and training of personnel, equipment and operations of the Department.

"12. Although some deficiencies were found throughout the Department, the deficiencies were the most serious and widespread in the Investigations Division, in the scientific laboratories and in the handling of personal property."

These findings are supported by substantial evidence, as was found by the superior court in its independent review of evidence.

According to Health and Safety Code sections 10250-10252 and Government Code sections 27460-27531, the primary mission of the Department is to determine the circumstances, manner, and causes of all deaths within its jurisdiction. The Department was required to perform autopsies in certain cases and to deliver death certificates as soon as possible after postmortem examinations. As coroner and Department head, Dr. Noguchi had the duty and responsibility to manage and administer the Department so that it could carry out its statutorily imposed duties effectively and efficiently. Dr. Noguchi acknowledged that his duties as Department head were "primarily administrative and management."

As coroner and head of the Department, Dr. Noguchi was directly and solely responsible to the Board, a fact that Noguchi has also acknowledged: "The Los Angeles County Chief Medical Examiner-Coroner is in fact a separate entity in that it is a department of this County's government. The Coroner is responsible only to the County's Board of Supervisors." In keeping with this responsibility, Dr. Noguchi was obligated to report directly to the Board and to keep the Board apprised of the state of the Department.

The 1982 audit, like the 1976 review, found that there were serious management problems in the Department that were directly attributable to

Dr. Noguchi. The 1982 audit concluded, inter alia, that there was a lack of adequate central management and control in the Department and that there was a lack of effective evidence control procedures in the Department. Moreover, the 1982 audit revealed that Dr. Noguchi had either failed to implement or had abandoned many of the recommendations made in the 1976 review to improve the Department's administration and operations. Each of the findings and recommendations of the 1982 audit was reviewed by the management audit team with Dr. Noguchi and Richard Wilson at an exit interview on March 4, 1982. The proof is uncontradicted that, except for one minor modification regarding the contracting out of histopathology slides, Dr. Noguchi concurred in and "signed off" on the findings of the 1982 audit.

The third report that established Dr. Noguchi's mismanagement was the 1982 Los Angeles County Grand Jury Review (Grand Jury Review) of the Department undertaken in compliance with the grand jury's statutory obligations under California Penal Code section 928.[1] It was conducted by the independent auditing firm of Peat, Marwick, Mitchell & Co. (Peat, Marwick), which had been selected by the grand jury to review the Department's general operational effectiveness, standards, procedures and data processing. The work of the Grand Jury Review was done under the direction of Thomas Snow, a Peat, Marwick partner and certified public accountant with extensive experience in review and audit of public agencies. Peat, Marwick's work was carried on separate and apart from the 1982 audit conducted by the CAO management services division. However, as with the 1982 audit, the findings and recommendations of the Grand Jury Review were concurred in and "signed off" by Dr. Noguchi before the report was issued.

The findings of the independently conducted Grand Jury Review were similar to the 1982 audit in a number of significant respects. Like the 1982 audit, the Grand Jury Review established that Dr. Noguchi had failed to manage and administer the Department. It concluded that the Department needed "to develop improved formalized task administration and enforcement capabilities in order to improve its overall level of performance and reduce instances of error and/or miscalculation"; that "[r]ecord and evidence storage physical facilities are insufficient and lack organization"; that testing equipment in the toxicology is obsolete and undependable; and that training procedures need improvement.

---

[1] Section 928 requires the grand jury to review and report on the operations of each department of county government on a selective basis.

*1. The Standard of Review to Be Applied by the Court Is Whether There Is Any Substantial Evidence to Support the Superior Court Judgment*

The rule enunciated in *Moran* v. *Board of Medical Examiners* (1948) 32 Cal.2d 301, 309 [196 P.2d 20], governs this case. As stated by the Supreme Court, the test to be applied on appeal is: ". . . whether the evidence, viewed in the light most favorable to petitioner [respondent], sustains the findings of the trial court . . . ."

*Moran* has been followed consistently in later cases. (*Bixby* v. *Pierno* (1971) 4 Cal.3d 130, 149 [93 Cal.Rptr. 234, 481 P.2d 242]; *Merrill* v. *Department of Motor Vehicles* (1969) 71 Cal.2d 907, 916 [80 Cal.Rptr. 89, 458 P.2d 33]; *Yakov* v. *Board of Medical Examiners* (1968) 68 Cal.2d 67, 71 [64 Cal.Rptr. 785, 435 P.2d 553].) Therefore, all conflicts in the evidence must be resolved in favor of the respondents, and all legitimate inferences drawn to uphold the judgment. (*Packer* v. *Board of Medical Examiners* (1974) 37 Cal.App.3d 63, 69 [112 Cal.Rptr. 76].)

Dr. Noguchi has the burden of showing that no substantial evidence supports the judgment. (*Gore* v. *Board of Medical Quality Assurance* (1980) 110 Cal.App.3d 184, 193 [167 Cal.Rptr. 881].) This obligation could be satisfied only by setting forth *all* of the material evidence pertaining to the challenged findings. Where an appellant claims that "'some particular issue of fact is not sustained, [he is] required to set forth in [his] brief *all* the material evidence on the point and *not merely [his] own evidence*. Unless this is done the error is deemed to be waived.'" (*Foreman & Clark Corp.* v. *Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362], citing *Davis* v. *Lucas* (1960) 180 Cal.App.2d 407 [4 Cal.Rptr. 479]; *Gold* v. *Maxwell* (1959) 176 Cal.App.2d 213, 217 [1 Cal.Rptr. 226]; *Cooper* v. *Cooper* (1959) 168 Cal.App.2d 326, 331 [335 P.2d 983]; see also *People* v. *Bestline Products, Inc.* (1976) 61 Cal.App.3d 879 [132 Cal.Rptr. 767].)

Unfortunately, Dr. Noguchi's brief devotes only two pages (46-47) to the "substantial evidence" issue. Those two pages attempt to throw the burden upon the court to search the record to show that there is no substantial evidence to sustain the judgment.

Appellant is fond of making sweeping statements and generalities such as "the majority of the allegations alleged by the County against Dr. Noguchi were found to have no merit whatsoever" and "politics perverting the Civil Service system" and of the bias and prejudice against Dr. Noguchi as well as the County's predetermination to remove him as coroner. The County did not and would not give Dr. Noguchi the opportunity to run the Department with the needed additional funds and personnel—more evidence of County's

arbitrary, capricious and bad faith actions in removing Dr. Noguchi from his rightful position as chief of the Department.

Although there is some question if such rhetoric is proper for a jury trial, there is no question that it is not helpful for the appellate process which must look at the facts to see if there is substantial evidence to sustain the trial court.

Here, there was a resume of 3,500 pages of transcript after a 19-day public well-publicized hearing along with a 1976-1982 audit by both the CAO; an independent audit and a Grand Jury Review along with a Commission review; and a four-to-one vote by the board of supervisors finding Dr. Noguchi should be demoted.

Further, we have a superior court judge who read the transcript, the decision of the administrative law judge, the arguments of the parties and the decision of the parties and thereafter exercised his own independent judgment. He found that the conclusions of the hearing officer were correct in regard to her findings and that the Commission was acting within its area of authority in demoting Dr. Noguchi.

Judge Epstein further stated, "[w]ith respect to the matter of penalty, I cannot say under the circumstances this is an abuse of discretion. For those reasons the conclusion I reach is that the petition for writ of mandate . . . is denied."

Further as discussed, *ante,* there was substantial evidence to support the superior court judgment as to Dr. Noguchi's mismanagement and his acting with the intent to misuse the power of his office.

2. *Was There Substantial Evidence to Support the Findings Dr. Noguchi Acted Improperly in the Eli Lilly & Co. Affair*

██ The second major issue related to a charge that Dr. Noguchi misused the power of the office of coroner by refusing to grant Dr. Bryan Finkle, a scientific researcher, access to public records of the Department unless a payment was made to the Life Institute, a foundation organized by Dr. Noguchi. As with the mismanagement findings, the findings that Dr. Noguchi acted with the intent to misuse the power of his office were detailed, specific and supported by the overwhelming weight of the evidence. The detailed findings were as follows: "51. In the fall of 1979 Dr. Bryan Finkle sought access to the records of the Department to conduct a study of Darvon-related deaths commissioned by Eli Lilly & Co. and was denied access.

"52. Dr. Furman of Eli Lilly & Co. requested the assistance of Dr. Litman of the Suicide Prevention Center in arranging access to the Department's records for Dr. Finkle.

"53. Dr. Litman discussed the matter with the Appellant.

"54. Initially, Appellant denied access to the records unless Dr. Finkle came into the Department under the auspices of the Life Institute of Medicine and Law, Inc., an organization in which Appellant was very interested.

"55. Appellant requested the Life Institute be recompensed in connection with providing the use of its name.

"56. A donation of $1,000 was made by the Suicide Prevention Center to the Life Institute from funds it had received for another Darvon-related study which had been commissioned by Eli Lilly & Co.

"57. The Appellant was aware at that time that the $1,000 donation had been made and knew of the source of the funds.

"58. After that donation had been received by the Life Institute the Appellant approved access to the records of the Department by Dr. Finkle, still with the requirement that he operate under the auspices of the Life Institute.

"59. Dr. Litman of the Suicide Prevention Center arranged for an additional donation from Eli Lilly & Co. to the Life Institute to be made again through the Suicide Prevention Center.

"60. The Appellant allowed Dr. Finkle access to the records of the Department after the second donation had been arranged and before it had been made.

"61. The $2,000 donation to the Life Institute with Eli Lilly & Co. funds did not show that the funds came from Eli Lilly & Co. and were received by the Life Institute well after Dr. Finkle had completed his review of the Department's records.

"62. The Appellant intended to misuse the power of the Office of the Chief Medical Examiner-Coroner by requiring that access to the Department's records be under the auspices of a foundation or institute in which the Appellant was interested.

"63. As part of that requirement, Appellant further required that funding be given to the foundation or institute.

"64. Ultimately the Appellant did not condition access to the Department's records on use of the auspices of the Life Institute, but the donation remained.

"65. Dr. Finkle made his review of the Department's records on February 5, 1982."

The evidence consisted primarily of the testimony of Dr. Bryan Finkle, as supported by his contemporaneous handwritten notes.

The hearing officer analyzed the evidence in this regard. "It is equally evident that the Appellant was seeking some advantage for the Life Institute, as he well knew that it had no staff, that it had never engaged in any kind of research and that there was nothing involved in the study which could not have been done either by Dr. Finkle or by a member of the Department's staff working outside his regular employment, as Dr. Nakamura was doing for Dr. Litman's Eli Lilly study.

"The fuzzy area is Appellant's involvement in the donations made by Eli Lilly through the Suicide Prevention Center to the Life Institute. It is not surprising that Mr. Cacioppo and Dr. Litman have vague recall of the events because of the passage of time, because there is hanging over the Issue a possibility of criminal prosecution, and, in the case of Dr. Litman at least, there is a history of working together with the Appellant for many years and the possibility of working together for many more years. Dr. Litman's explanations of the facts recounted above are inherently incredible, except that he had the second donation to the Life Institute funneled through him so that the Suicide Prevention Center could get its money back from the Life Institute. It is also inherently incredible, given Dr. Finkle's undisputed testimony regarding Appellant's reference to the donation in the January 14th telephone conversation, that the Appellant was unaware of the December donation. When asked by Mr. Isaac, Dr. Finkle explicitly stated that Appellant had never placed the situation on a quid pro quo basis that a donation would have to be made before Dr. Finkle would be allowed access to the Department's records. But Dr. Finkle went on to reply, in response to a subsequent question by Mr. Masterson: "'Well, it seemed to me that implicit in Mr. Isaac's question was that there was an equation here that unless I or my sponsors could put up money, then there could be no access to the records; the job couldn't be done. No such implied or direct equation was ever expressed to me in those terms. On the other hand, when we were discussing the means by which this work might be done and the route through the Life Institute was being discussed, then certainly donations, the need for funding was brought up. And, in those terms, it was

clear that if that route had been used, then it couldn't be used without some funding.'

"It appears to the Hearing Officer that there was a switch of position toward the end of Finkle's attempts to get into the Department to review the records. For the reasons discussed above, it can be inferred from the facts that the Appellant would require that Dr. Finkle come into the Department under the auspices of the Life Institute and that the Life Institute would receive a donation from Eli Lilly for providing its name and, perhaps, scheduling or other services. For some reason, perhaps connected with the dismissal of Mr. Cacioppo from his position of Executive Director of the Life Institute toward the end of January, Appellant backed away from that position.

"It is impossible to tell from the record whether the amount of the donation was ever specified or even discussed by the Appellant or if it was determined by Dr. Litman alone, in the first instance, and by agreement with Dr. Furman, in the second instance. Dr. Litman's undated budget showed that he had allocated $1,000 to pay Dr. Nakamura for his own study, although Dr. Nakamura ultimately was paid considerably less than half that amount. It is clear that Dr. Litman considered Eli Lilly a 'deep pocket'. It is impossible to tell from the facts whether Appellant knew of Dr. Litman's request for a donation on January 29th or if he knew that the $2,000 donation had originated with Eli Lilly when it finally came to him, well after Dr. Finkle had completed his work.

"For these reasons, the Issue as posed must be held to have been established only in intent. The Appellant intended to condition access to the records of the Department on the employment of or requiring the use of the auspices of the Life Institute and, as part of that requirement, requiring that funding for that purpose be supplied. Ultimately, the Appellant did not enforce that requirement and the Respondent has not established that the donation made by Eli Lilly to the Life Institute was, as matters worked out, a condition precedent to Dr. Finkle's having access to the records of the Department."

The evidence thus made it plain that the $2,000 paid to the Life Institute was neither a proper charitable contribution nor a payment for services rendered. It was requested and received to influence an official act. As such, it was a misuse of the power of his office.

Given the above, there was clearly substantial evidence to support the findings that Dr. Noguchi acted with the intent to misuse the power of his office by blocking access to public records unless and until a "donation"

was made to a foundation in which he was interested. The superior court, after reweighing the evidence, so found and its determination should be upheld by this court.

### B. *Was There a Lack of Due Process*

Appellant cites four circumstances of lack of due process and each point will be considered below.

All such arguments regarding due process were rejected by the superior court. ▇ In an instance such as this, where the appeal is before this court without superior court findings or a statement of decision, the role of the appellate court is as stated in *Golde* v. *Fox* (1979) 98 Cal.App.3d 167, 174 [159 Cal.Rptr. 864]: "Our role in the absence of findings is laid out in *Price* v. *Price* (1952) 114 Cal.App.2d 176, 179 [249 P.2d 841]: 'the appellate court will not weigh the evidence to determine what is true and what is not, *but will assume that the trial court found every fact essential to support the judgment,* and will search the record for the purpose only of determining *whether there is substantial evidence supporting the judgment* and will resolve all doubts in favor of the judgment. [Citation.]' (See also *Beehan* v. *Lido Isle Community Assn.* (1977) 70 Cal.App.3d 858, 861 [137 Cal.Rptr. 528]; *Lane & Pyron, Inc.* v. *Gibbs* (1968) 266 Cal.App.2d 61, 65 [71 Cal.Rptr. 817].)" (Italics added.)

The superior court found against each of Dr. Noguchi's "due process" contentions. The court's appropriate role is thus limited to an inquiry as to whether there was any substantial evidence to support the superior court's independent determination.

### 1. *Is There Evidence to Support the Claim That the Board Was Prejudiced Against Dr. Noguchi*

▇ There is no evidence from which to infer that the Board was prejudiced against Dr. Noguchi. Just saying it is so, doesn't make it so. The basis of Dr. Noguchi's claim in this regard is that the Board asked the office of the CAO to conduct an audit of Dr. Noguchi's Department. The Board later met with the CAO to review a draft of the audit report and thereafter instructed the CAO to ask for Dr. Noguchi's resignation. The fact that the hearing officer stated as follows: "There was a question raised, both inferentially in cross examination and in argument by Appellant, that the CAO audit staff was 'out to get' the Appellant. There was some support for this belief in the audit report, which includes some matters which are ancient and others which are, in computer terminology, 'glitches' rather than problems of any magnitude, or which are really philosophical choices, but are

never so described." This does not mean that the Board and the CAO conspired against Dr. Noguchi.

Further, the hearing officer stated that wherever possible she looked to the testimony of non-CAO witnesses or used evidence of objective determination generated by the CAO. Also, the hearing officer had the testimony of the Grand Jury Review which was similar to the CAO report.

The Board's actions certainly do not suggest any prejudice. As the employing agency, the Board is obligated to monitor as best it can the various county departments. And when the draft of an audit report revealed significant managerial problems in the Department, the Board would have been remiss in its duty if it did not investigate the Department head involved. That such action was clearly warranted is demonstrated by the substantial evidence of Dr. Noguchi's mismanagement and failure to manage.

The only other claim of alleged bias or improper motive is Dr. Noguchi's discredited "Proposition 13" defense, wherein he said that his Department was in poor shape since he did not get enough money. That evidence showed that Dr. Noguchi never appeared before the board of supervisors during the regular budget process since at least 1975; that of four written requests for more funding made by Dr. Noguchi after 1975, the board of supervisors granted each, except for one (which amounted to $25,905) made immediately after passage of Proposition 13; and that Dr. Noguchi's Department received in excess of 90 percent of requested funds.

### 2. *Was There a Lack of Due Process Before the Commission*

■■■■ Dr. Noguchi's second due process claim relates to the Commission's decision that it would not accept all of the conclusions and recommendations of the hearing officer. His claim is that the Commission could not reject any portion of the hearing officer's report and impose discipline stronger than that recommended, unless the commissioners read the transcript and exhibits.

First, there is no evidence in the record that the Commission did not familiarize itself with the record before making its final decision. The hearing officer's report was filed on February 10, 1983, with the final action by the Commission not until April 6, 1983. Dr. Noguchi said only that the commissioners "never have contended that they reviewed the transcript or read and considered the evidence." ■■■■ This statement is not evidence, and it is certainly not sufficient to rebut the presumption that the Commission regularly performed all official duties imposed on it. (*Santa Clara Federation*

*of Teachers* v. *Governing Board* (1981) 116 Cal.App.3d 831 [172 Cal.Rptr. 312].)

 Secondly, even if the members of Commission had not made an independent review of the records, the error (if any) was cured by the superior court's independent review which is the subject of this appeal. The decision of this district in *Gore* v. *Board of Medical Quality Assurance* (1980) 110 Cal.App.3d 184, 190 [167 Cal.Rptr. 881], is directly on point: "There is no merit in petitioner's claim that the administrative procedure prescribed by section 11517, subdivision (c) of the Government Code is unconstitutional because it authorizes respondent board to decide the case for itself if the proposed decision by the administrative judge is not adopted.

*"The requirements of due process of law are fully met, where, as here, the licensee was accorded judicial review of the administrative decision in which the court weighed the evidence and rendered its independent judgment on the merits. (Moran* v. *Board of Medical Examiners* (1948) 32 Cal.2d 301, 308 [196 P.2d 20]; *Murphy* v. *Board of Medical Examiners* (1946) 75 Cal.App.2d 161, 162 [170 P.2d 510]; *Hohreiter* v. *Garrison* (1947) 81 Cal.App.2d 384, 401-402 [184 P.2d 323]; *Tringham* v. *State Board of Education* (1958) 50 Cal.2d 507, 509 [326 P.2d 850].)" (Italics added; see also *Cooper* v. *State Bd. of Medical Examiners* (1950) 35 Cal.2d 242 [217 P.2d 630, 18 A.L.R.2d 593].)

Appellant states that the rule enunciated in *Gore* and *Cooper* is not applicable since he says that the superior court did not consider his due process arguments. However, appellant's claim to that effect is completely unfounded. Appellant waived the requirement of a statement of decision by failing to request it in time. Hence, the record before this court is such that it must be assumed that the superior court found every fact essential to support the judgment, including finding against Dr. Noguchi on his alleged denial of due process. (See *Golde* v. *Fox, supra,* 98 Cal.App.3d at p. 174.)

*Mennig* v. *City Council* (1978) 86 Cal.App.3d 341 [150 Cal.Rptr. 207] was a case involving a situation where the City Council of Culver City, the employer agency, instituted disciplinary proceedings against its police chief. Petitioner Mennig had exercised the appeal rights afforded him by the civil service rules of Culver City. At the civil service commission's hearing, each of the council persons who had participated in the discipline testified in support of the charges. The civil service commission disagreed with the discipline imposed and recommended a lesser discipline. (*Id.,* at p. 348.)

The Culver City Council then took it upon itself to enact a resolution, the net effect of which was a disapproval of the recommendation of the

civil service commission and a reinstatement of the penalty of discharge. (*Id.*, at p. 349.) On mandate, the superior court determined that by reason of the personal involvement of its members, the city council was "not an independent tribunal entitled to review the decision of the Civil Service Commission" and hence the discharge was not valid.[2] The Court of Appeal affirmed, noting the "personal involvement" of the members of the city council. (*Ibid.*)

In this case the Commission agreed with the disciplinary action taken by the board of supervisors. Secondly, the board of supervisors herein has not attempted to counteract the judgment of the civil service commission. Further, and as noted above, even if there were some defect in the proceedings before the Commission, it was cured by the "independent review" afforded to Dr. Noguchi by the superior court. (*Gore* v. *Board of Medical Quality Assurance, supra,* 110 Cal.App.3d at p. 184.)

3. *Counsel for the County and the Law Firm of Which He Was a Member Should Have Been Disqualified from the Civil Service Commission Hearing*

At the Commission hearing, counsel for Dr. Noguchi moved to disqualify William Masterson as attorney for the County as well as the law firm of Rogers & Wells, of which Mr. Masterson was a partner. In each instance, appellant claims the hearing officer committed prejudicial error by not disqualifying Mr. Masterson and Rogers & Wells.

Rule 7-104 of the Rules of Professional Conduct of the State Bar of California states as follows: "A member of the State Bar shall not threaten to present criminal, administrative, or disciplinary charges to obtain an advantage in a civil action nor shall he present or participate in presenting criminal, administrative, or disciplinary charges solely to obtain an advantage in a civil matter."

Rule 2-111, subdivision (A)(4) of the Rules of Professional Conduct of the State Bar of California states in pertinent part as follows: "If upon or after undertaking employment, a member of the State Bar knows or should know that the member ought to be called as a witness on behalf of the

---

[2]We note the members of the Commission are appointed for fixed terms and can only be removed for cause rather than serving at the pleasure of the board of supervisors. (L.A. County Charter (1979 rev.) art. 9, § 31.) Thus, we need not consider whether due process would be satisfied where a commission composed of "at pleasure" appointees reviewed a discharge initiated by the same board which had the authority to remove the members of the commission if displeased with the decision they reached.

member's client in litigation concerning the subject matter of such employment, the member may continue employment only with the written consent of the client given after the client has been fully advised regarding the possible implications of such dual role as to the outcome of the client's cause and has had a reasonable opportunity to seek advice of independent counsel on the matter. . . ."

Rule 7-105 of the Rules of Professional Conduct of the State Bar of California provides in pertinent part: "A member of the State Bar shall refrain from asserting his personal knowledge of the facts at issue, except when testifying as a witness."

At the Commission hearing, appellant claims counsel for the County violated each of the aforementioned Rules of Professional Conduct. In this case Mr. Masterson first invited Dr. Noguchi's attorney, on the record, to call him as a witness and then testified at the Commission hearing with respect to his activities and assistance to the district attorney's office in attempting to prosecute Dr. Noguchi in the Eli Lilly matter. In addition, Mr. Masterson called an associate in his law firm to testify as a witness regarding certain facts of this case in an attempt to impeach Dr. Lukash, whom the County had asked to evaluate Dr. Noguchi's performance. The question is whether the personal knowledge and credibility of Mr. Masterson and his firm were put in issue.

Appellant claims by Mr. Masterson's and his associates' assertions of their personal beliefs, they not only violated rule 7-105, *supra,* but also irredeemably compromised their position as objective advocates at the Commission hearing. Moreover, appellant states, in actively assisting the district attorney's office in attempting to get the district attorney to file criminal charges, an unethical advantage might have been gained. Though the charges were never filed against Dr. Noguchi and Dr. Noguchi was civilly vindicated by Hearing Officer Adler's decision on the merits, demoting or even terminating Dr. Noguchi would have been automatic had he been convicted of a criminal offense.

The first problem Dr. Noguchi faces on this issue is that it was not presented to the superior court for determination, either by the mandate petition or the motion for a peremptory writ. For reasons best known to himself, Dr. Noguchi did not urge this matter before the superior court. Having failed to present the issue to the superior court, Dr. Noguchi is in no position to raise that issue as error on this appeal. (*Doers* v. *Golden Gate Bridge etc. District* (1979) 23 Cal.3d 180 [151 Cal.Rptr. 837, 588 P.2d 1261]; 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 250, p. 257.)

However, it must be assumed that the superior court found against Dr. Noguchi's claim in that regard since Dr. Noguchi waived a statement of

decision. (*Golde* v. *Fox, supra,* 98 Cal.App.3d at p. 174.) Given Dr. Noguchi's waiver, the sole issue remaining is whether there was substantial evidence to support the superior court's independent determination.

 There is substantial evidence to support the superior court's decision. Counsel for Noguchi had charged counsel for the County with a violation of rule 7-104 of the Rules of Professional Conduct. Specifically, counsel was charged with "cajoling, manipulating and providing information" to the district attorney about the Eli Lilly matter in order to gain some advantage for the County in the Commission proceeding. Specifically, counsel was charged with "misconduct."

The gist of his testimony was that he had been asked for certain information by the district attorney's office and had supplied it; that he had not sought to have Dr. Noguchi indicted; and that he had not been directed by the board of supervisors to go to the district attorney's office.

There was thus substantial evidence in support of the hearing officer's and the superior court's determinations that the disqualification claim had no merit. Further, there could be no disqualification of counsel for such compelled testimony since (1) the testimony was not voluntary in any sense, but was rather given after service of subpoena, and (2) such compelled testimony did not relate to the merits of the Eli Lilly controversy but rather went to the threshold question of its admissibility. Indeed, counsel for Dr. Noguchi stated that he wanted to put opposing counsel on the stand and to question him ". . . not on the merits of the case."

As to the testimony of William Mulligan, an associate from the New York office of counsel for the county, Mulligan was called as a witness to impeach certain testimony of a Dr. Lukash. This matter also is not referenced in the mandate petition or the motion for a peremptory writ, so it is also questionable whether it is properly before the court. (*Doers* v. *Golden Gate Bridge etc. District, supra,* 23 Cal.3d 180.) But even if it is, there was substantial evidence to justify the rejection of the claimed disqualification by both the hearing officer and the superior court.

Rule 2-111, subdivision (A)(4) provides that where an attorney ought to be called as a witness on behalf of his client, such testimony is permissible and will not result in a disqualification if the client gives an informed written consent. Such consent was given, presented to the hearing officer and Dr. Noguchi was advised of the substance thereof. Thus, there was clearly substantial evidence to support the hearing officer's and the superior court's rejection of the claim.

### 4. *Did the Hearing Officer Have a Conflict of Interest and Should She Have Recused Herself*

 Just prior to the commencement of the Commission hearing, the husband of Hearing Officer Sara Adler became a new partner in the law firm of Irell & Minella. Irell & Minella was representing the law firm of Rogers & Wells, counsel for the County, in a pending litigation matter. Moreover, at the time of the Commission hearing, Rogers & Wells was defending Irell & Minella in a civil suit brought against Irell & Minella. Appellant contends that, because of the community property laws of this state, and the fact that the hearing officer's husband had a beneficial interest in Irell & Minella, a conflict of interest existed.

When counsel for the County learned that the spouse of the hearing officer had joined a firm with which counsel had a working relationship, counsel for the County was the one who disclosed that matter to the court. Both the hearing officer and the Commission then ruled that such a slight connection did not require a recusal and that Dr. Noguchi had not carried his burden of proof with respect thereto. This was clearly correct and the superior court's determination that the claim had no merit should be sustained.

 As with the disqualification of counsel, this claim was not set forth as a ground for relief either in the mandate petition or the motion for a peremptory writ. Given this fact, there is some question if it can be assigned as error on the appeal. (*Doers* v. *Golden Gate Bridge etc. District, supra,* 23 Cal.3d at p. 180.) But even if the issue is properly before the court, Dr. Noguchi's waiver of a statement of decision means that this court must assume that the superior court found against Dr. Noguchi's position. (*Golde* v. *Fox, supra,* 98 Cal.App.3d at p. 174.) The sole issue then remaining is whether there was substantial evidence to justify the superior court's determination that the hearing officer was not required to recuse herself.

Upon discovery of this conflict, counsel for Dr. Noguchi requested that the hearing officer recuse herself from the administrative hearing. Further, counsel for Dr. Noguchi made a motion to disqualify the hearing officer due to the conflict of interest.

Not only did the hearing officer refuse to recuse herself, the Commission denied Dr. Noguchi's motion for disqualification.

Code of Judicial Conduct, canon 3C provides in pertinent part as follows: "(1) A judge should disqualify himself in a proceeding in which his dis-

qualification is required by law, or his impartiality might reasonably be questioned, including but not limited to instances where:

" . . . . . . . . . . . . . . . . . . . . .

"(c) he knows that he, individually or as a fiduciary, or his spouse . . . has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;

" . . . . . . . . . . . . . . . . . . . . .

"(c) 'financial interest' means ownership of a legal or equitable interest, however small . . . ."

Code of Judicial Conduct, canon 3D provides: "A judge disqualified by the terms of Canon 3C(1)(c) or Canon 3C(1)(d) may, instead of withdrawing from the proceeding, disclose on the record the basis of his disqualification. If, based on such disclosure, the parties and lawyers, independently of the judge's participation, all agree in writing that the judge's relationship is immaterial or that his financial interest is insubstantial, the judge is no longer disqualified, and may participate in the proceeding. . . ."

In the case at bench, due to the hearing officer's spouse being a partner in a law firm representing counsel for the County, it does not seem a financial interest was present or that her impartiality could be questioned. Further, the hearing officer was not a judge, although she was conducting herself as one.

The civil service commissioners made a determination that Ms. Adler should not be disqualified. Notwithstanding these facts, alleging bias, Hearing Officer Adler's findings of fact and conclusions of law made her recommendation not to demote Dr. Noguchi. It would seem in fact there was no bias on the part of Hearing Officer Adler in that appellant now wants to follow her decision or if there was bias, it was cured by her decision.

C. *Was There Abuse of Discretion in the Demotion of Dr. Noguchi*

The issue is whether there was substantial evidence to support the superior court's determination that there was no abuse of discretion in his demotion.

First, did appellant waive his right to a statement of decision?

Appellant claims because the trial court judge did not make any comment regarding Dr. Noguchi's due process claim that the judge did not weigh the

evidence and render its independent judgment. Code of Civil Procedure section 632 states as follows: "In superior, municipal, and justice courts, upon the trial of a question of fact by the court, written findings of fact and conclusions of law shall not be required. Upon the request of any party appearing at the trial, made within 10 days after the court announces a tentative decision, or if the trial has lasted less than one day, made prior to submission of the matter for decision, the court shall issue a statement of decision explaining the factual and legal basis for its decision as to each of the principal controverted issues at trial. The request for a statement of decision shall specify those controverted issues as to which the party is requesting a statement of decision. After a party has requested such a statement, any party may make proposals as to the content of the statement of decision.

"The statement of decision shall be in writing, unless the parties appearing at trial agree otherwise; however, when the trial has been completed within one day, the statement of decision may be made orally on the record in the presence of the parties."

The facts indicate that the hearing started on June 22, 1984, and lasted for less than a day. It was after the superior court pronounced its decision, that Dr. Noguchi requested a written statement of decision. The superior court rejected the request as not timely, since it was made after the pronouncement of the decision rather than before submission as required by section 632.

Having waived the statement, appellant cannot effectively assert on appeal that the superior court did not rule on all his claims. For under existing law, it is assumed that the superior court did so rule and that its rulings were in favor of the judgment. (*Golde* v. *Fox, supra,* 98 Cal.App.3d at p. 174.)

 This court does agree that the Commission and the trial court were bound to exercise legal discretion and must be impartial in taking into account all relevant facts, together with legal principles which must not be arbitrary. (*Harris* v. *Alcoholic Bev. etc. Appeals Bd.* (1965) 62 Cal.2d 589 [43 Cal.Rptr. 633, 400 P.2d 745]; *California Assn. of Nursing Homes, etc.* v. *Williams* (1970) 4 Cal.App.3d 800 [84 Cal.Rptr. 590].)

 Also, the law is settled that an appellate court has the authority to control the amount of penalty imposed upon a civil servant when there is an abuse of discretion by a lower court. (*Harris* v. *Alcoholic Bev. etc. Appeals Bd., supra,* 62 Cal.2d 589; *Szmaciarz* v. *California State Personnel Bd.* (1978) 79 Cal.App.3d 904, 921 [145 Cal.Rptr. 396].)

In the case at bench there is substantial evidence that Dr. Noguchi received all of the due process requirements to which he was entitled and there was no evidence of lack of a fair trial with a biased decisionmaker.

Appellant's counsel must have more reason than an advocate's reason that the bias and prejudice and conspiracy are so; other than because he says it is; it is so.

The propriety of a personnel action against a civil service employee, such as Dr. Noguchi, was a matter resting in the sound discretion of the employer-agency. The exercise of that discretion could not be disturbed unless there had been a clear abuse of discretion. (*Blake* v. *State Personnel Board* (1972) 25 Cal.App.3d 541, 553 [102 Cal.Rptr. 50]; see also *Ackerman* v. *State Personnel Bd.* (1983) 145 Cal.App.3d 395 [193 Cal.Rptr. 190].) The superior court correctly found no abuse of discretion and its determination should be upheld.

A review of disciplinary action involves consideration of "'the extent to which the employee's conduct resulted in, or if repeated is likely to result in, "[h]arm to the public service" . . ., the circumstances surrounding the misconduct and the likelihood of its recurrence.'" (*Caveness* v. *State Personnel Bd.* (1980) 113 Cal.App.3d 617, 631 [170 Cal.Rptr. 54].)

Of these three factors, harm to the public service is the "overriding consideration." (*Skelly* v. *State Personnel Bd.* (1975) 15 Cal.3d 194, 218 [124 Cal.Rptr. 14, 539 P.2d 774].)

Dr. Noguchi attempted to rely on *Skelly* which found as follows: "Generally speaking, '[i]n a mandamus proceeding to review an administrative order, the determination of the penalty by the administrative body will not be disturbed unless there has been an abuse of its discretion.' [Citations.] Nevertheless, while the administrative body has a broad discretion in respect to the imposition of a penalty or discipline, 'it does not have absolute and unlimited power. It is bound to exercise legal discretion, which is, in the circumstances, judicial discretion.' (*Harris* [v. *Alcoholic Bev. etc. Appeals Bd., supra,* 62 Cal.2d 589, 594]; *Martin* [v. *Alcoholic Bev. etc. Appeals Bd.,* 55 Cal.2d 867, 876 (13 Cal.Rptr. 513, 362 P.2d 337)]; *Bailey* v. *Taaffe* (1866) 29 Cal. 422, 424.) In considering whether such abuse occurred in the context of public employee discipline, we note that the overriding consideration in these cases is the extent to which the employee's conduct resulted in, or if repeated is likely to result in, '[h]arm to the public service.' [Citations.] Other relevant factors include the circumstances surrounding the misconduct and the likelihood of its recurrence." (*Id.,* at p. 217.)

The Supreme Court in *Skelly* v. *State Personnel Bd., supra,* 15 Cal.3d at page 218, applying those principles, concluded that the discipline imposed on Dr. Skelly was clearly excessive and reversed the decision of the trial court.

In applying the principles of *Skelly* to the case at bench, there are some distinguishing factors. Those factors are summarized under headnote eight in *Skelly* which provides: "[i]n dismissing a physician with the status of a permanent civil service employee on the basis of his extension of his alloted lunch time by five to fifteen minutes, and in twice leaving his office for several hours without permission, the State Personnel Board abused its discretion, where the record failed to show that such deviations adversely affected the public service, but did disclose that he more than made up the lost time by working during nonworking periods, and that he was informative, cooperative, helpful, extremely thorough, and productive." (*Id.,* at p. 196.)

■ The case at bench can be distinguished from *Skelly* in that Dr. Noguchi was not fired but merely reduced to a lower grade as a physician specialist, M.D., and is still employed some four years later with the County.

That, although sustaining the County's position as to mismanagement and abuse of power, the hearing officer recommended that the 30-day suspension be in the nature of a "final warning" to Dr. Noguchi and that he not be removed from office.

The reason for the recommendation seems to be as follows: The County had not prevailed on all the charges and the County did not appear to have sustained civil liability. Nor did it appear that criminal prosecutions had been compromised or even commenced by reason of the mishandling of evidence.

Appellant makes great weight of the fact that of the eleven issues adopted by the Commission, the hearing officer exonerated Dr. Noguchi for wrong conduct in all but three. However, there was no requirement that the County prove all charges. The issue of discipline, as framed by the Commission, was that if "any or all" of the issues were proven, discipline should be imposed. The County did not have to prevail on all issues to sustain the discipline imposed.

The principal charge made by the County was that Dr. Noguchi's management of his Department was inferior. By a preponderance of the evidence, the hearing officer found for the County on that major issue. In her "Findings of Fact, Conclusions of Law, Recommendation" (hearing officer's report)

at pages 78-81, she stated, inter alia: "16. Appellant's [Noguchi's] management of the Department has been deficient.

". . . . . . . . . . . . . . . . . . . . . .

"25. Due to these [referring to specific managerial deficiencies in prior findings] and numerous other deficiencies, the Department was unable to meet acceptable standards of service delivery to the constituent law enforcement agencies and to members of the general public.

"26. Appellant has been responsible for the failure of the Department to meet accepted standards for service delivery."

The hearing officer also discussed Dr. Noguchi's performance as a county manager in the following terms: "It seems clear from the evidence that [Noguchi] was either incapable of or relatively uninterested in working out the daily management problems of the Department, and it would not have mattered if he had been physically present and/or uninvolved with his non-management concerns.

". . . . . . . . . . . . . . . . . . . . .

"[Noguchi] did not, in the years in question here, ever provide the day-to-day kind of leadership or hands-on management which would have resulted in more orderly functioning of the Department. . . ."

Also, the hearing officer's speculation as to the level of management competence in other county departments was not a reason to refrain from imposing discipline, where here the misconduct on the part of Dr. Noguchi had been documented and proven.

The record shows that Dr. Noguchi had numerous opportunities to have his Department operate efficiently but failed to fulfill his managerial duties. There have been many well-publicized hearings and Los Angeles Times articles regarding specific problems in the coroner's office. There were management audits in 1976 and 1982 along with an independent audit by the grand jury in 1982 in which Dr. Noguchi failed to pass muster.

Because the hearing officer found that no harm to public service was done and that it was unlikely that such misconduct would reoccur, this does not mean the Commission and the trial court have committed a prejudicial abuse of discretion whereby the penalty upon Dr. Noguchi should be reversed. (*Skelly* v. *State Personnel Bd., supra,* 15 Cal.3d at p. 218; *Shepherd* v. *State Personnel Board* (1957) 48 Cal.2d 41, 51 [307 P.2d 4]; *Lake* v.

*State Personnel Board* (1972) 25 Cal.App.3d 541, 551-554 [102 Cal.Rptr. 50].)

With respect to the Eli Lilly matter, the hearing officer found that ". . . this was an aberrational bit of behavior by appellant."

However, the findings showed that Dr. Noguchi had intended to misuse the power of his office by requiring that legitimate access to public records of his Department be conditioned on the party seeking access making a donation to a foundation in which Dr. Noguchi was interested.

Appellant makes great weight out of the fact that Dr. Noguchi is a physician (presumably subject to the view that doctors are poor at business), but this would not excuse his conduct.

The managing of the coroner's office involved skills in running a multi-million dollar department of the County of Los Angeles. The findings indicate mismanagement. Dr. Noguchi does not deny the management problems and unfortunately has not the managerial skills to correct them.

Here, appellant is asking the court to intervene at a management level and substitute its discretion in place of the Board in running the county government. This the court is reluctant to do in the absence of showing a clear abuse of discretion or a violation of due process which has not been indicated in this case.

This situation is analogous to where the State Bar or the Commission on Judicial Performance makes certain recommendations regarding the discipline of an attorney or a judge and the Supreme Court can accept the findings of the State Bar or the commission or it can impose a lesser or greater penalty depending upon its independent judgment and how it perceives the severity of the matter before it.

In this case, the Commission, and the Board decided to demote Dr. Noguchi to a physician surgeon, M.D., with the coroner's office based upon two audits by the CAO, the findings of the hearing officer (albeit not the recommendations of the hearing officer). This was reviewed by a superior court judge who, on exercising his own independent judgment, upheld the findings of the Commission.

This does not denigrate the reputation of Dr. Noguchi, an outstanding pathologist and forensic scientist, but it does indicate he lacks the managerial

skills and administrative ability to run the coroner's office effectively. Further, these deviations have adversely affected the operation of the coroner's office.

There was no abuse of discretion in the action by the Board as substantiated by the independent review of the superior court. That court's findings are supported by the evidence.

Therefore, the judgment of the superior court is affirmed.

Lillie, P. J., and Johnson, J., concurred.

A petition for a rehearing was denied January 7, 1987, and appellant's petition for review by the Supreme Court was denied March 11, 1987.